*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 19**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

JOHN EDWARD GALLEGOS,
*Petitioner.*

No. 20180890
Heard November 12, 2019
Filed April 29, 2020

On Certiorari to the Utah Court of Appeals

Second District, Weber County
The Honorable Judge Mark R. DeCaria
No. 111900879

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen.,
Salt Lake City, for respondent

Emily Adams, Bountiful, Cherise Bacalski, Orem, for petitioner

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1   A jury convicted John Gallegos of attempted murder. Gallegos asked the court of appeals to overturn that conviction, arguing that his trial counsel rendered ineffective assistance by, among other things, failing to call an expert whom his prior counsel had previously identified and disclosed. This uncalled expert would have testified about the problems inherent in eyewitness identifications. Gallegos also moved the court to remand under Utah Rule of Appellate Procedure 23B so that he could supplement the

record with facts concerning the uncalled expert and explore the reasons his trial counsel declined to use the witness at trial.

¶2   The court of appeals affirmed Gallegos's conviction. A partially dissenting member of that court opined that he would have granted the rule 23B motion to allow Gallegos to try and establish that he was prejudiced by his trial counsel's deficient performance. We granted a petition for certiorari to address whether the court of appeals erred by: (1) denying the rule 23B motion; and (2) concluding that trial counsel's failure to call the eyewitness testimony expert did not result in ineffective assistance. We affirm the court of appeals.

## BACKGROUND[1]

¶3   On a dark night, the victim (Victim) parked his RV next to Lester Park in Ogden, intending to spend the evening. While in his RV, Victim heard the unmistakable hiss of an aerosol can and the rumpus that sometimes accompanies tagging. Concerned that his RV might be used as a canvas for someone's street art, Victim ventured outside to protect his vehicle.

¶4   Victim saw a group of men spray painting a building about fifty feet away. As soon as the group spotted Victim, they sprinted toward him. Victim tried to back away, but the group encircled him. Before Victim had a chance to say anything, one member of the group repeatedly struck Victim. While that man was attacking Victim, the others in the group began throwing rocks, cans, and garbage at Victim. The men were accompanied by dogs that they permitted to attack and bite Victim.

¶5   Throughout the attack, Victim's primary assailant stood about four feet away. The assailant would step forward to punch Victim, retreat four or five feet, and then repeat the attack. Victim experienced trouble breathing and realized that he was being stabbed. Victim testified that when he "grabbed [his] chest . . . the blood skirted out." Victim was facing the attacker, and the attacker was the only person near Victim in that direction. Victim later testified that if blood were found on any person in the group, it would be on the attacker.

---

[1] "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 (citation omitted) (internal quotation marks omitted).

¶6 At least four eyewitnesses saw the attack. Three of these witnesses—N.G., K.C., and D.L.—were driving by the park together when they saw the altercation. D.L. jumped out of the vehicle to assist Victim. He yelled at the group of men and started to approach the crowd. One of the men in the group, who held something in his hand, shouted at D.L., "You want some too homey? Get the fuck back in the truck." D.L. ran back to the truck and yelled for N.G. to call the police. This apparently motivated the group who had been attacking Victim to flee.

¶7 Police and paramedics arrived within five minutes of N.G.'s call. R.S., who had been in the park with his girlfriend during the attack, told an officer that Victim's assailant was wearing a white shirt. R.S. also told the officer that he saw some of the group get into a car to leave the park. By apparent coincidence, as R.S. was speaking to the officer, he saw that same car drive past. R.S. alerted the officer.

¶8 Additional officers arrived. One left to investigate the car that R.S. identified. The officer saw Gallegos walking away from a vehicle matching the description R.S. had provided. The officer talked to Gallegos and searched his name for warrants. He testified that he saw Gallegos's age when he ran the search and realized that Gallegos was under the legal drinking age; a fact that assumed importance because Gallegos appeared to be intoxicated.

¶9 The officer asked if Gallegos was a gang member. Gallegos said he was. In response to the officer's question, Gallegos indicated he did not have any weapons on him. After the officer received Gallegos's permission to search him, the officer found a knife in Gallegos's back pocket. The officer told Gallegos that since Gallegos seemed quite intoxicated, the officer would hold onto the knife, and Gallegos could retrieve it from the police station after he sobered up. Since Gallegos did not match the initial description of the suspect— wearing a white shirt—the officer did not detain him. The officer did not notice any blood on the knife or on Gallegos.

¶10 Within thirty minutes after the encounter with Gallegos, a police officer interviewed D.L., who had been occupied tending to Victim's injuries. Unlike R.S., D.L. recalled that the primary assailant was wearing dark clothes. D.L., according to the testimony of two

police officers, also told the officers that Victim's assailant had tripped and fallen to his hands and knees while running away.[2]

¶11  The officers updated the suspect's description. After hearing the updated description, the officer that initially stopped Gallegos examined the knife that he had taken from Gallegos and saw, for the first time, blood. Another officer was then sent to find the dark-shirt wearing Gallegos.

¶12  A few minutes later, the officer apprehended Gallegos near the park, close to a vehicle matching the description R.S. had provided. Another officer noticed that Gallegos had what appeared to be blood on his ears, knuckles, palms, shirt, and pants. Yet another officer observed that Gallegos's pants were torn at the knee, that blood, dirt, and black material were on Gallegos's knee, and that Gallegos had scrape marks on his palms.

¶13  Shortly after officers had detained Gallegos, and while still near the park, an officer drove D.L. to a curb where Gallegos sat, uncuffed, with a spotlight shining on him. While sitting in the car, D.L. identified Gallegos as Victim's primary assailant. D.L. also identified Gallegos later that evening at the police station.

¶14  After D.L.'s identification, the police placed Gallegos in handcuffs and read him his *Miranda* rights. Gallegos waived his rights and spoke to the officers. An officer testified that Gallegos explained the blood on his hands as a vestige of having been "boxing with a homey" earlier in the day. Gallegos explained his torn pants and scraped hands and knees as the result of having tripped while running from the police prior to having arrived at the park.[3]

¶15 The following day, Victim, from his hospital bed, was shown a photo lineup of six men. From that group of photographs, Victim identified Gallegos as his attacker.

---

[2] A third officer testified that D.L. saw someone in the group fall as he was running away, but the record is not clear whether that officer believed that D.L. was talking about Victim's primary assailant. R.S. also reported seeing one of the men in the group "jump[ ] off the curb, . . . [fall] and [get] back up and [start running.]"

[3] An officer later testified that he asked police dispatch if any officer had reported a chase. Police dispatch was not aware of a chase occurring in Ogden.

¶16 DNA tests showed that the blood found on Gallegos, Gallegos's clothes, and the knife Gallegos was carrying in his back pocket was Victim's.

¶17 The State charged Gallegos with, among other things, attempted murder.[4]

¶18 Gallegos had multiple court-appointed attorneys and at one point was self-represented.[5] Gallegos's first trial attorney saw the need to have the jury hear from an expert on eyewitness identifications and moved the court to appoint Dr. Julie Buck as an expert on the topic. The court obliged. Dr. Buck prepared a report on problems that can arise when eyewitnesses are asked to identify specific suspects. Dr. Buck also discussed issues with the line-up procedures police employed that, she opined, biased the process against Gallegos. The attorney who secured Dr. Buck's appointment ceased representing Gallegos.

¶19 Seven months before trial, the district court appointed the attorney who would represent Gallegos at trial. According to an affidavit Gallegos submitted in support of his rule 23B motion, roughly three weeks before trial, trial counsel visited Gallegos at the prison. During that visit, Gallegos asked trial counsel about Dr. Buck. Trial counsel had previously told Gallegos that he did not know that Dr. Buck had been retained. However, on the day of this visit, trial counsel told Gallegos that he had read Dr. Buck's report and had concluded that her testimony would not be helpful.

¶20 At trial, the State introduced the testimony of a number of witnesses to the attack, including Victim, D.L., N.G., K.C., and R.S. Victim and D.L. both testified that they identified Gallegos as the assailant. As he had informed Gallegos, trial counsel elected not to put on any expert testimony regarding the limitations of eyewitness identification.

---

[4] Gallegos was also charged with, and convicted of, threatening or using a dangerous weapon in a fight, graffiti, unlawful consumption of alcohol by a minor, possession or use of a dangerous weapon by a restricted person, assault by a prisoner, and propelling a substance or object at a correctional or peace officer. Gallegos does not challenge these convictions.

[5] A different set of attorneys represents Gallegos on appeal and certiorari.

¶21 The jury convicted Gallegos on all seven counts. Applying gang and weapons enhancements, the district court sentenced Gallegos to serve nine years to life for the attempted murder conviction.[6]

¶22 Gallegos appealed, arguing, among other things, that his trial counsel rendered ineffective assistance. Gallegos moved under Rule of Appellate Procedure 23B to supplement the record with facts concerning his trial counsel's alleged ineffective assistance. In addition to his own affidavit, Gallegos supported his motion with two others.

¶23 Michael D. Bouwhuis, trial counsel's supervisor, averred that while trial counsel was representing Gallegos, he was also assisting Bouwhuis in a capital murder case. Bouwhuis assigned trial counsel to interview and prepare trial subpoenas for twenty witnesses. Trial counsel assured Bouwhuis that he was performing his assigned tasks. However, Bouwhuis later learned that trial counsel did not speak to "a substantial number of the witnesses assigned to him." Bouwhuis also became aware that trial counsel's contract with Weber County to provide indigent defense services had been terminated.

¶24 Dr. Buck also provided an affidavit. Dr. Buck affirmed that she provided her report to Gallegos's previous counsel in July 2014, almost a year before the trial. Despite this, trial counsel never contacted her.

¶25 Dr. Buck described her report. She reported that the photo lineup shown to Victim was designed in a fashion that made it more likely that someone would choose Gallegos over the other possibilities. Dr. Buck had also concluded there were numerous issues with the ability of the eyewitnesses to make an accurate identification of the suspect because of the circumstances under which they viewed the assailant. For example, her report detailed a number of factors that can impact the ability of a witness to correctly identify someone. These included the duration of the event, attention

---

[6] Gallegos was also sentenced to not more than five years for assault by a prisoner; not more than five years for the possession of a dangerous weapon by a restricted person; one year for propelling a substance or object at an officer; one year for use of a dangerous weapon in a fight; and 180 days each for the convictions related to graffiti and unlawful possession or consumption of alcohol by a minor. The court ordered the sentences to run concurrently.

to the perpetrator, the risk of source confusion, the presence of multiple perpetrators, the presence of a weapon, the eyewitness's stress, and the lighting at the time of the crime.

¶26 The court of appeals denied Gallegos's rule 23B motion, reasoning that Gallegos had failed to explain how the evidence he wanted to place in the record would have changed the trial's outcome. *State v. Gallegos*, 2018 UT App 192, ¶ 22, 437 P.3d 388.

¶27 The court of appeals also concluded that trial counsel had not provided ineffective assistance by failing to call Dr. Buck. It reasoned that an attorney is not legally obligated to call an expert to talk about the issues surrounding eyewitness testimony. The court also concluded that there was a strategic reason why trial counsel could decide to not use Dr. Buck's testimony. Additionally, the court of appeals determined that an abundance of other evidence tied Gallegos to the crime such that any testimony Dr. Buck might have offered would not have changed the result at trial. *See id.* ¶¶ 29–48.

¶28 One member of the court of appeals panel dissented from part of the decision. That judge would have granted the rule 23B motion because he believed that Gallegos should have the opportunity to augment the record with additional facts concerning prejudice. The dissent opined that if "Gallegos is eventually able to demonstrate that his attorney was unprepared, or that his attorney acted ineffectively by failing to call an eyewitness identification expert" then the "contours of the 'prejudice' inquiry may look a lot different." *Id.* ¶ 70 (Harris, J., concurring in part and dissenting in part).

¶29 We granted a petition for certiorari.

### ISSUE AND STANDARD OF REVIEW

¶30 Gallegos raises two issues for our review. He first asks us to agree that the court of appeals erred by concluding he failed to present a sufficient basis for remand pursuant to rule 23B. He then asks us to overturn the court of appeals' conclusion that he failed to demonstrate prejudice arising from his counsel's alleged ineffective assistance.[7]

---

[7] Before the court of appeals, Gallegos also argued that his counsel was ineffective in failing to seek to sever the charges against him. The court of appeals agreed that trial counsel should have sought severance but concluded that this misstep did not prejudice Gallegos. We did not grant certiorari on that question.

(continued ...)

¶31 Both of these issues present questions that we review for correctness. "'On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard[s] of review used by the court of appeals. We conduct that review for correctness, ceding no deference to the court of appeals.'" *State v. Wilder*, 2018 UT 17, ¶ 15, 420 P.3d 1064 (alteration in original) (citation omitted).

## ANALYSIS

¶32 A majority of the court of appeals concluded that, even if it were to permit Gallegos to supplement the record with the facts in his affidavits, Gallegos could not establish that his trial counsel rendered ineffective assistance of counsel. Gallegos raises four arguments in an effort to convince us that the court of appeals erred. First, Gallegos claims that the majority prematurely reached its conclusion on his rule 23B motion. Second, that the court of appeals applied the wrong standard to assess whether he received ineffective assistance of counsel. Third, that trial counsel's decision to not call an already identified expert constituted deficient performance. And fourth, that the court of appeals incorrectly concluded that Gallegos suffered no prejudice from trial counsel's failure to put Dr. Buck on the stand.

¶33 It is well understood that "'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted); *see also State v. Garcia*, 2017 UT 53, ¶ 35, 424 P.3d 171. In an ineffective assistance of counsel claim, we employ the two-part test *Strickland* established, "which requires the

---

Gallegos nevertheless briefed the question of whether the court of appeals erred by concluding that he suffered no prejudice from his counsel's failure to seek severance. Although we did not grant certiorari on that issue, we can see how Gallegos may have read our order as including that issue. The State, either because Gallegos briefed the issue, or because it read our order in the same fashion, responded to Gallegos's argument. Because of the confusion our order apparently engendered, and because the parties have both briefed the issue, we will address this question, albeit briefly. For the reasons the court of appeals articulated in its opinion, we conclude that trial counsel's decision not to move to sever the charges did not prejudice Gallegos. *See State v. Gallegos*, 2018 UT App 192, ¶¶ 47–48, 437 P. 333; *see also id.* ¶ 69 n.15 (Harris, J., concurring in part and dissenting in part).

defendant to show (1) 'that counsel's performance was deficient' and (2) that 'the deficient performance prejudiced the defense.'" *Menzies v. State*, 2014 UT 40, ¶ 75, 344 P.3d 581 (quoting *Strickland*, 466 U.S. at 687). "*Strickland*'s prejudice prong requires a court to 'consider the totality of the evidence before the judge or jury' and then 'ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *Garcia*, 2017 UT 53, ¶ 28 (citation omitted).

¶34 As to *Strickland*'s first prong, "the inquiry into counsel's performance should focus on 'whether counsel's assistance was reasonable considering all the circumstances.' We 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Menzies*, 2014 UT 40, ¶ 76 (citations omitted). Furthermore, "we give wide latitude to trial counsel to make tactical decisions and 'will not question such decisions unless there is no reasonable basis supporting them.'" *State v. Bedell*, 2014 UT 1, ¶ 23, 322 P.3d 697 (citations omitted).

¶35 To assess whether counsel's performance was deficient, we "look at the facts and law available to counsel at the time of the representation." *Menzies*, 2014 UT 40, ¶ 76 (citation omitted). Hence, Gallegos must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

¶36 "In short, the question of deficient performance 'is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial.'" *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (quoting *State v. Barela*, 2015 UT 22, ¶ 21, 349 P.3d 676).

¶37 Gallegos has the burden to overcome a strong presumption of reasonableness "which he must do by 'identify[ing] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.'" *State v. Hutchings*, 2012 UT 50, ¶ 18, 285 P.3d 1183 (alteration in original) (quoting *Strickland*, 466 U.S. at 690).

## I. The Court of Appeals Did Not Err in Denying the Rule 23B Motion

¶38 Gallegos first avers that the court of appeals erred when it denied his rule 23B motion. Rule 23B embodies our rule-based attempt to solve a dilemma faced by an appellant who wants to show that her counsel was ineffective but lacks the facts in the record she would need to demonstrate that ineffective assistance. The rule "provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel but which do not appear in the record." *State v. Griffin*, 2015 UT 18, ¶ 17, 441 P.3d 1166.

¶39 Rule 23B(b) requires that the motion be "accompanied by affidavits alleging facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney. The affidavits must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." In short, the attached affidavits and documents must allege facts, together with those already in the record, that will demonstrate both deficient performance and prejudice. *See* UTAH R. APP. P. 23B(b).

¶40 Rule 23B is not an invitation to fish for facts. "The mere hope that an individual may be able to provide information if subpoenaed to testify is not sufficient. An affiant must submit specific facts and details that relate to specific relevant occurrences." *Griffin*, 2015 UT 18, ¶ 19. A motion that merely speculates about what a remand might uncover will not suffice because "[p]ermitting a remand for speculative allegations would not only 'be inconsistent with the presumption of sound trial strategy, it would likely open a floodgate of incomplete and fragmented ineffective assistance claims on direct appeal.'" *Id.* (quoting *State v. Hopkins*, 1999 UT 98, ¶ 13 n.1, 989 P.2d 1065).

¶41 We acknowledge Gallegos's efforts to meet this burden and commend him for providing affidavits that outline the facts he knew that support his claim of ineffective assistance of counsel. But we ultimately agree with the court of appeals majority that "Gallegos's motion fails to establish facts that, if true, would have likely changed the result here." *State v. Gallegos*, 2018 UT App 192, ¶ 25, 437 P.3d 388. As detailed more fully below, the evidence against Gallegos was substantial, and Dr. Buck's testimony was far from likely to have tipped the balance of the evidence towards a more favorable outcome for Gallegos. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("The defendant must show that there is a *reasonable probability*

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (emphasis added)).

¶42 Indeed, Gallegos's motion and affidavits focus primarily on his trial counsel's decision not to call Dr. Buck to the stand to testify in his defense. Bouwhuis's affidavit suggests that because trial counsel was not doing his assigned work in the capital case they were working on together, trial counsel likely did not work on Gallegos's case the way he should have. Gallegos's affidavit speaks to trial counsel's lack of interest and familiarity with the case, including the work Dr. Buck had performed, and the seemingly off-handed way trial counsel concluded that the expert testimony would not help Gallegos's case. And Dr. Buck's affidavit addresses, generally, the testimony she would have provided. As a result, the affidavits, as the court of appeals recognized, spoke to trial counsel's deficient performance without addressing, in any substantive way, the effect that Dr. Buck's testimony would have had on the outcome of trial. *See Gallegos*, 2018 UT App 192, ¶¶ 22, 25.

¶43 Gallegos repeats that pattern in his briefing before this court. Gallegos takes aim at trial counsel's strategy, or perceived lack of strategy, but does not hone in on the court of appeals' conclusion that, even if trial counsel's performance was deficient, Gallegos suffered no prejudice. For example, Gallegos argues that the court of appeals "engaged in unfounded speculation about trial counsel's strategy." But even if we were to accept the argument, this does not speak to the court of appeals' conclusion that granting the rule 23B motion would ultimately not help Gallegos because he could not show prejudice. *Id.* ¶ 25.

¶44 Gallegos's argument also relies heavily on the partially dissenting court of appeals judge's analysis and reasoning. The dissent would have granted the rule 23B motion to allow Gallegos to add to the record the subjective reasons why trial counsel decided not to use Dr. Buck. *Id.* ¶ 71 (Harris, J., concurring in part and dissenting in part). The dissent was concerned, justifiably, that counsel did not pay enough attention to Gallegos's case. *Id.* ¶ 60. The dissent opined that failure to "hold even one substantive meeting with one's client for nine months" after being retained and only to do so when ordered by the court is "substandard attorney conduct in a case as serious as this one." *Id.* ¶ 61.

¶45 The dissent was also concerned with counsel's failure to call Dr. Buck at trial. *Id.* ¶¶ 60, 62. He concluded that the majority speculates about why trial counsel may have chosen not to use Dr. Buck. *Id.* ¶ 68. In the end, the dissent was "not comfortable definitely

answering the 'prejudice' question in this case until after the rule 23B motion is resolved." *Id.* ¶ 70.

¶46 We credit the dissent's concerns. Gallegos's allegations, if true, paint the picture of an attorney failing to give his client the attention his case deserves. And that is, of course, very concerning. But while we share those concerns with the court of appeals dissent, we are not persuaded that they dictate a different outcome than the one the court of appeals majority reached, primarily because it was not necessary to remand to place counsel's subjective reasons for not calling Dr. Buck into the record.

¶47 The *Strickland* inquiry is objective, not subjective. *See Strickland*, 466 U.S. at 690 ("The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.") While trial counsel's subjective thinking may inform what an objectively reasonable attorney may have done when presented with the same circumstances, counsel's subjective understanding is not the standard by which her actions are judged. *See id.* at 688 ("[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness."). Counsel can, for example, do the right thing for the wrong reason. But that would not constitute ineffective assistance of counsel if an objectively reasonable attorney would have taken the same approach. *See State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (restating the standard is "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial"). Accordingly, trial counsel's subjective reasoning is not the critical component of the *Strickland* inquiry.[8] *See e.g.*, *State v. Sessions*, 2014 UT 44, ¶ 21, 342 P.3d 738 ("*Strickland* assesses the objective sufficiency of counsel's performance, not the subjective adequacy of counsel's knowledge.").

¶48 Moreover, we, like the court of appeals majority, do not see the same link between trial counsel's deficient performance and the prejudice inquiry. The dissent concluded that if "Gallegos is

---

[8] We do not mean to suggest that trial counsel's subjective understanding is irrelevant to the inquiry. We can envision instances where knowing trial counsel's thinking will illuminate the question of what a reasonable attorney would or would not do. But we reject Gallegos's argument that the court of appeals could not conduct the *Strickland* inquiry without knowing the actual basis for trial counsel's decision.

eventually able to demonstrate that his attorney was unprepared, or that his attorney acted ineffectively by failing to call an eyewitness identification expert, the contours of the 'prejudice' inquiry might look a lot different." *Gallegos*, 2018 UT App 192, ¶ 70 (Harris, J., concurring in part and dissenting). This seems to conflate *Strickland*'s two prongs into a single inquiry, which is problematic because even the most blatant error in judgment will not warrant a new trial under *Strickland* if the mistake does not prejudice the defendant.[9]

¶49 Take, for example, an attorney who fails to file a motion to suppress her client's confession that he robbed a bank. In this hypothetical, appellate counsel can show, through affidavit, that trial counsel did not file the motion because she fundamentally misunderstood the law. Appellate counsel can also demonstrate that this is a motion to suppress that a district court would grant ten times out of ten because the answer is dictated by existing precedent.

¶50 But further assume that, at the same time, the factual record contains, in addition to the confession, the trial testimony of a half dozen witness who saw the defendant rob the bank while exclaiming his name, social security number, and Hotmail password. The record also contains surveillance video unambiguously showing the defendant committing the robbery, and a text the defendant sent saying, "Just robbed the bank. Be home soon."

¶51 Under *Strickland*'s two-part test, even that egregious failure to file a motion to suppress would not result in a new trial because no prejudice resulted from counsel's objectively unreasonable

---

[9] The dissent could also be read to say that the prejudice inquiry might be different because, on remand, Gallegos could supplement the record with testimony from Dr. Buck that was so powerful no reasonable attorney would fail to introduce Dr. Buck's testimony. And that testimony would change the prejudice calculus and undermine confidence in the verdict. That, however, is problematic for a different reason. Rule 23B requires Gallegos to, as a condition for remand, outline what Dr. Buck's testimony would have been. Rule 23B does not permit Gallegos to use remand as the mechanism to find out what Dr. Buck would have said at trial. In other words, if the court of appeals was not convinced that Dr. Buck's testimony would have materially altered the prejudice analysis from the affidavits submitted in support of the rule 23B motion, Gallegos did not meet his burden of establishing the need for a remand to place facts into the record.

decision. *See Strickland*, 466 U.S. at 687. Thus, we cannot accept the dissent's suggestion that additional facts coming into the record about trial counsel's performance would change the prejudice inquiry; at least, none of the facts about trial counsel's performance that Gallegos wanted to place into the record would have changed the prejudice inquiry here.

¶52 For these reasons, the court of appeals majority correctly denied Gallegos's rule 23B motion.

## II. The Court of Appeals Did Not Apply an Incorrect *Strickland* Standard

¶53 Gallegos next argues that the court of appeals applied a legally incorrect version of the *Strickland* standard to reach its conclusion. The court of appeals reasoned that there "was a conceivable basis for trial counsel's decision," and that therefore, Gallegos did not receive ineffective assistance of counsel. *State v. Gallegos*, 2018 UT App 192, ¶¶ 27, 56, 437 P.3d 388. Gallegos argues that the "no-conceivable-tactical-basis tool has no support in United States Supreme Court jurisprudence on ineffectiveness."

¶54 Gallegos surveys the legal field and reports that he can find no United States Supreme Court case using a "no conceivable tactical basis" articulation of the *Strickland* standard. Gallegos then looks to federal circuit cases and offers that the standard appears in only ten cases in the thirty-five post-*Strickland* years and that in none of those cases is the phrase a centerpiece of the analysis.[10] Gallegos contrasts that with Utah jurisprudence where, according to Gallegos, it has become a hallmark.

¶55 Gallegos has a point. We, and to a larger degree the court of appeals, have developed a tendency to ask whether there is a conceivable tactical basis for an attorney's decision as a proxy for analyzing whether a trial attorney's challenged decision is objectively reasonable. *See e.g., State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *State v. Garcia*, 2017 UT App 200, ¶ 19, 407 P.3d 1061; *State v. Allgood*, 2017 UT App 92, ¶ 30, 400 P.3d 1088; *State v. Bryant*, 965 P.2d 539, 542–43 (Utah Ct. App. 1998).

¶56 We recently addressed this practice and its potential to distort the *Strickland* analysis. *See State v. Ray*, 2020 UT 12, — P.3d —.

---

[10] Based on our own research expanding on variations of "conceivable tactical basis," we agree that this term has not been used frequently or prominently outside of the Beehive State.

We explained that an appellate court does not err by asking whether counsel may have had a sound strategic reason for the challenged action or omission. *Id.* ¶ 36. *Strickland* instructs that a defendant must ultimately overcome the presumption that an attorney's decision "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. If an attorney's decisions can be explained by a reasonable trial strategy, the defendant has necessarily failed to show deficient performance. *Ray*, 2020 UT 12, ¶ 34 (citing *Strickland*, 466 U.S. at 688).

¶57 "But the converse is not true." *Ray*, 2020 UT 12, ¶ 34. The *Strickland* inquiry does not necessarily end just because the reviewing court cannot conceive of a sound strategic reason for counsel's challenged action. A reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission caused her representation to fall below an objective standard of reasonableness. *Id.* Here, that would mean assessing whether failure to call Dr. Buck caused Gallegos's trial counsel's representation to fall below a standard of objective reasonableness. *See, e.g., id.* ¶ 36 ("[W]e must ask whether defining indecent liberties was sufficiently important under the circumstances that counsel's failure to argue for a clarifying jury instruction fell below an objective standard of reasonableness."). Although determining whether there may have been a sound strategic reason for counsel's act or omission is a way to try and answer the question of whether counsel's performance was objectively reasonable, it is neither the only way, nor the end of the inquiry.

¶58 Here, the court of appeals considered whether Gallegos's counsel may have had a "conceivable tactical basis" for not calling the expert witness, which we view as synonymous with asking whether counsel may have had a sound strategic reason for this decision. We nevertheless understand Gallegos's concern with the use and application of the "conceivable tactical basis" test. Language matters and, over time, even small variations can take on lives of their own and distort the analysis. We persist in thinking that if there exists a "conceivable tactical basis" that explains how a reasonably objective attorney could have chosen the same course as trial counsel, a court can conclude that counsel's performance satisfies *Strickland*. But we take this opportunity to disavow any notion that the "no conceivable tactical basis" language means anything other than the *Strickland* standard. The Supreme Court has spoken. And we are duty bound to follow.

¶59 Although we have acknowledged that variations in language might cause a court to stray from the appropriate test, the

court of appeals' use of a "conceivable tactical basis" test did not do so here. The court of appeals looked to see whether Gallegos's trial counsel's decision to not call Dr. Buck to testify was objectively reasonable. The court of appeals reasoned that it did not need to conclude that counsel had "a specific strategy in mind" but only that there existed a "plausible strategic explanation for counsel's behavior" which calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Gallegos*, 2018 UT App 192, ¶ 26 (citation omitted) (internal quotation marks omitted).

¶60 The court of appeals concluded that there was a conceivable basis that putting Dr. Buck on the stand "carried too significant a possibility that cross-examination by the State would serve only to solidify and repeatedly highlight the State's arguments concerning factors that made the eyewitness identification credible." *Id.* ¶ 27. Additionally, the court of appeals cited its own as-of-yet unchallenged precedent that it is not *per se* ineffective to fail to call an expert on eyewitness testimony. *See id.* ¶ 26.

¶61 Accordingly, the court of appeals' reasoning comports with the *Strickland* standard. Once the court of appeals determined that there was a reasonable strategic explanation for not calling Dr. Buck, Gallegos had necessarily failed to show that counsel was deficient. *See Ray*, 2020 UT 12, ¶ 34. We cannot agree with Gallegos that the court of appeals broke rank with *Strickland* when it relied upon the "no conceivable basis" articulation to evaluate whether Gallegos received ineffective assistance from his counsel.[11]

### III.  Gallegos Has Not Shown Prejudice

¶62 Even if trial counsel's conduct was professionally unreasonable, this "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

¶63 "*Strickland* requires that 'any deficiencies in counsel's performance must be prejudicial to the defense.' The defendant

---

[11] As noted above, Gallegos raises an additional argument—that the court of appeals erred by concluding that the decision to not call Dr. Buck to the stand was objectively reasonable. Because this court unanimously agrees that Gallegos was not prejudiced by his counsel's failure to call Dr. Buck, we deliberately do not offer an opinion on whether the failure to use Dr. Buck in this instance fell below an objective standard of reasonableness.

generally has the obligation to affirmatively prove prejudice and 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Menzies v. State*, 2014 UT 40, ¶ 77, 344 P.3d 581 (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* ¶ 91 (quoting *Strickland*, 466 U.S. at 694).

¶64 "Further, '[i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.' Instead, '[t]he likelihood of a different result must be substantial, not just conceivable.'" *Menzies*, 2014 UT 40, ¶ 91 (alterations in original) (citations omitted); *see also State v. Nelson*, 2015 UT 62, ¶ 28, 355 P.3d 1031. "*Strickland* asks whether it is 'reasonably likely' the result would have been different . . . . The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (citations omitted).

¶65 Here there is no substantial probability of a different result had Gallegos's trial counsel called Dr. Buck to testify. There is no information or testimony that Dr. Buck, as an expert on suspect identifications by eyewitnesses, would have offered that would have countered the other evidence the jury heard that pointed to Gallegos.

¶66 Gallegos was found with a knife in his back pocket. This knife tested positive for Victim's blood. When asked about the knife, the officer testified that Gallegos indicated he had given it to one of his colleagues earlier and had just been given it back when the officer stopped him.

¶67 Gallegos was found with Victim's blood on his body and clothing. A swab of blood from behind Gallegos's ear tested positive for Victim's blood. Victim's blood was also found on Gallegos's shirt and pants. The jury did not hear any expert testimony on how much blood would come from the stab wound or how the blood would spatter or spray. But the jury did hear Victim testify that when he grabbed his chest "blood skirted out," and he was facing the assailant. Victim stated that only one person was stabbing him, that there was only one person "around nearly that close," and that "the guy that was stabbing me was the only one that was around at that point that was in that direction." Victim further testified that "I have a good feeling if there was any blood on anybody, it's a very good chance that's probably where it came from."

¶68 Finally, the jury heard testimony from two police officers that they were told that the man who stabbed Victim tripped and fell when fleeing the scene. Another officer testified that D.L. told him

someone in the group fell while running away from the park. R.S. also testified that a man in the group tripped, fell, got up, and continued running away. When Gallegos was taken into custody, he had skinned knees and scraped hands consistent with tripping and falling. The jury saw photographs and heard testimony regarding Gallegos's scraped hands and knees.

¶69 Gallegos indicated he got those injuries when he ran from officers earlier that night. But the jury heard a police officer testify there had been no foot chases reported that evening.

¶70 Dr. Buck's report and likely testimony related only to D.L.'s and Victim's identifications of Gallegos as the assailant. Specifically, Dr. Buck's affidavit and report opine that the lineup shown to Victim was not fair, and there was significant bias toward Gallegos. Additionally, Dr. Buck reported that there were "significant issues" regarding the reliability of the identifications by Victim and D.L., especially relating to the quality of the lineup, the use of a showup identification, the cross-race effect, duration of the event, attention to the perpetrator, the risk of source confusion, the presence of multiple perpetrators, the presence of a weapon, the eyewitnesses' stress, and the lighting at the time of the attack.

¶71 Dr. Buck's testimony would have been aimed at casting doubt on the testimony of the two witnesses who identified Gallegos as the assailant. But Dr. Buck's testimony would have done nothing to diminish the strength of the other evidence the State introduced. The jury heard that Gallegos was found with the knife with Victim's blood, Victim's blood on his body and clothes, and injuries consistent with testimony that the attacker, whoever it was, tripped and fell as he was fleeing the park.

¶72 Thus, we are not convinced there is a substantial likelihood of a different result such that it undermines our confidence in the outcome of the trial. *See Nelson*, 2015 UT 62, ¶ 28. Accordingly, Gallegos cannot show prejudice, and his claim for ineffective assistance of counsel fails.

## CONCLUSION

¶73 The court of appeals did not err in denying Gallegos's rule 23B motion, nor was Gallegos prejudiced by his trial counsel's decision not to call Dr. Buck. We affirm.

————