2021 UT App 86

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OSCAR ALONSO NUNEZ,
Appellant.

Opinion
No. 20190317-CA
Filed August 12, 2021

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 151403242

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1    After being convicted of various child sex abuse charges, Oscar Alonso Nunez now portrays his trial as a series of errors. His accuser, Kiara[1], testified poorly at trial. To compensate, the State offered her Children's Justice Center interview to support each element of the charges. In addition, the court replaced a struggling juror during deliberations. Nunez claims the trial court erred in its rulings on these events and, for these and other reasons, seeks reversal. We affirm.

---

1. A pseudonym.

BACKGROUND

¶2      In late 2015, the State charged Nunez with two counts of sodomy on a child, two counts of rape of a child, and one count of attempted sodomy on a child against his fiancée's eight-year-old daughter, Kiara. At trial, the State called Kiara as its first witness. But, instead of providing testimony establishing each element of the charged conduct, Kiara testified only that, on more than one occasion, Nunez pulled off her pants and underclothes and touched her vagina with his fingers, and that he forced her to touch his penis with her hands. Kiara could not testify as to whether Nunez touched her vagina with anything else besides his finger or whether he forced her to touch his penis with anything else besides her hands.

¶3      Recognizing that this testimony alone would fail to support the charges, the prosecutor acknowledged, "I don't think it's any secret, but things didn't quite go the way I had planned," and in light of this, the State sought to introduce a video recording of Kiara's interview at the Children's Justice Center (CJC interview), which did contain statements supporting each element of the charges. The State moved to introduce the CJC interview under Utah Rule of Evidence 801(d)(1)(A) as a non-hearsay prior inconsistent statement. In opposition, defense counsel argued, among other things, that he "didn't think the scope of Rule 801(d)(1)(A), which is prior inconsistent denied or forgotten statements[,] was meant to be so broad as to allow the State to play the entire tape, but only to play portions of the tape . . . inconsistent with the precise accusations she made on the stand." (Cleaned up.) After taking into account Nunez's objection, the trial court ruled that the State could play only certain CJC interview segments that contained statements inconsistent with Kiara's trial testimony and that could not otherwise be reasonably separated from the consistent statements. The court also ruled that Kiara had to take the stand

for an opportunity to explain or deny the CJC interview's contents.

¶4    To lay foundation for the CJC interview, the State called the Children's Justice Center interviewer (CJC interviewer) to testify about the protocol followed while conducting an interview. She stated, "[W]e always [elicit] them to promise to tell the truth." The State then played the CJC interview for the jury, wherein Kiara described the occurrence of vaginal intercourse (rape), oral sex (sodomy), and attempted oral sex (attempted sodomy).

¶5    Afterward, the State asked Kiara about the statements she made in the interview. Although she acknowledged that she "didn't remember a lot of things" she had said in the CJC interview, she testified that she did "[n]ot really" "disagree" with any of the statements she made in the CJC interview. To further corroborate Kiara's allegations, the State offered—and the court received—evidence of Kiara's relevant medical examinations that showed her vaginal area to be "exquisitely tender," "swollen and puffy," "irritat[ed]," and "inflamed and red looking." These "injuries were consistent with [Kiara's] reported abuse."

¶6    To further support its case, the State called Nunez's daughter from a previous marriage (Witness), to testify about her observations of interactions between Kiara and Nunez. Because the parties had stipulated to omit certain accusations of abuse against Kiara alleged to have occurred in Wyoming, the parties hotly disputed whether Witness's testimony referred to the Wyoming accusations. In an apparent attempt to exclude the testimony by establishing that Witness's testimony would relate to the Wyoming accusations, defense counsel placed Nunez on the stand to clarify the "layout" of the homes in which Nunez had lived. But after hearing the testimony, the trial court ruled that the State had met its burden to show that Witness's

testimony related to the charges at issue in the case and allowed the testimony to proceed. Among other things, Witness testified that on one occasion, when Nunez had called Kiara into his bedroom, she put her ear to the door and heard Kiara say, "Stop it. I don't want to do this anymore. I want to leave." Witness further testified that Kiara told her that Nunez was "touching [Kiara's] privates" but not to "tell anybody" because Nunez "would hurt" Kiara, her mom, and Kiara's little sister.

¶7    Outside the jury's presence, defense counsel successfully moved to strike Witness's testimony that Kiara told her that Nunez was "touching [Kiara's] privates" and the testimony that Kiara told Witness not to "tell anybody" because Nunez "would hurt" Kiara, her mom, and Kiara's little sister. However, before the court instructed the jury to disregard the stricken testimony, the parties stipulated to show the jury another portion of the CJC interview. In that portion of the CJC interview, Kiara said, in contradiction to Witness's trial testimony, that Nunez had never threatened her. Given that defense counsel had "addressed the matter in a different fashion" by introducing the contradictory statements, defense counsel withdrew the motion to strike. And the trial court, recalling "the presentation of the evidence" and how the defense had dealt with it, indicated that it recognized the alternative trial strategy, stating, "Right. That's what I could tell."

¶8    Defense counsel also sought to admit impeachment evidence showing bias and suggesting that Witness had motivation to misrepresent the facts because Nunez's ex-wife—Witness's mother—was hostile toward Nunez and had opportunity to coach Witness into lying on the stand. The trial court rejected the evidence, stating,

> This evidence is intended to indicate or to imply . . . an adversarial situation of feelings between [Nunez's ex-wife], [Witness's] mother, and

> [Nunez], [Witness's] father. The evidence of those adversarial feelings between [Witness's] mother and father is intended to imply a motive on [Witness's] mother's part to lie if lying would hurt [Nunez]. The inference of [Witness's] mother's motive to lie is intended to imply a motive on [Witness's] mother's part to encourage [Witness] to lie too. . . . That inference is proposed to imply that [Witness's] mother did in fact encourage [Witness] to lie. And that inference is proposed to imply that [Witness] also did in fact lie. The [c]ourt concludes that that proposed testimony is too far removed from the facts that are relevant to this case.

The trial court made this ruling, in part, because defense counsel had not offered "independent foundation . . . to show that any of the alleged hostility between [Witness's] mother and [Nunez] was actually communicated to [Witness]." Further, it found that "[a]ny feelings [Witness] may have had or motives she had to lie were not explored and she was not impeached while she was on the witness stand, so an attempt to impeach her now behind her back and through [another witness] . . . [was] . . . unfairly prejudicial." The trial court also blocked defense counsel's attempts to offer similar evidence, stating that allowing such evidence "could just completely hijack" the trial because the allegedly impeaching evidence was not explored when Witness testified and that "insufficient foundation [had been] laid to go now one or two steps removed from her to try to now use that to impeach her."

¶9     During closing argument, the prosecutor argued that even though Kiara had difficulty testifying on the stand, she had no difficulty speaking several years earlier during her CJC interview—which the prosecutor emphasized was "close in time to when this sexual abuse happened." He then stated that she "was repeatedly abused" and "repeatedly raped," and that

"maybe [Kiara] had those many times confused." The prosecutor also noted that, when interviewing Kiara, the CJC interviewer employed a protocol "intended to elicit accurate information" and that the protocol is used "in an effort to get a good, reliable, honest, detailed statement." The prosecutor finally argued that "[j]ust because [Kiara] elaborate[d] and provide[d] more detail" in her CJC interview than she did on the stand "that's not an inconsistency. That's consistency. But there's nothing, at least, inconsistent about it." Defense counsel raised no objection to the prosecutor's argument.

¶10    Not long after the jury retired for deliberations, the trial court started receiving questions from the jury. While acknowledging they were not yet "hung," the jurors asked, "If the jury is hung, what is the next step?" The trial court declined to answer the question. The next day, as deliberations continued, the jury asked, "Are we able to have a verdict on some counts and be hung on other counts?" The trial court responded in the affirmative. Soon after, the jury asked, "Can we go to [an extended] lunch and allow a juror to be alone to gather her t[h]oughts? It's hard to be in the room and not deliberate without all being present." Around that same time, one juror (Juror 35) requested to speak privately with both counsel and the court. The trial court sent the jurors to lunch but held back Juror 35. In a discussion in chambers, the trial court and both counsel discussed how to speak with Juror 35 "without her discussing things that cannot be discussed." The court determined to

> tell her at the outset you've asked to speak to us and you've declined to go back into the jury room. So apparently you're insisting now on speaking to us, but you cannot say a single thing about what is being discussed in the jury room, what you've said or what anybody else has said. We cannot hear a single thing about any of that. Make sure she

understands that and then see if she wants to talk
about her mental or emotional health.

The trial court then explained to both counsel that they were "in a corner" because Juror 35 had "declined to go back into the jury room until she talk[ed] to [them]." In response defense counsel stated, "I think . . . we should make a record of what she says, and we should hear from her. . . . If you admonish her sternly that we don't want to hear anything about what's being discussed in the jury room, just what her condition is."

¶11 The court then invited Juror 35 into chambers and stated, "[Y]ou cannot tell us anything about what's going on in the jury room as far as what's being discussed, who said what, what you've said, how you feel about the evidence or the verdict. That is sacrosanct and we cannot hear a single word about that." Juror 35 indicated understanding and then explained that she had "a history of depression and anxiety" that she "didn't think . . . was going to be a problem." She continued,

> But as we are in the jury room, I'm experiencing some anxiety that I, um, being in the situation that I am in, I don't know like how it will affect me mental—it's hard for me not to say like why—
>
> . . . .
>
> —but I just am experiencing some anxiety because of this situation that I feel like that I am in in the jury room.

Juror 35 struggled to fully communicate her concerns without being able to discuss the deliberations.

¶12 The trial court asked,

> [I]f you could look forward in time, do you believe
> that you can participate a little further at least, and
> that would not scar you emotionally for the rest of
> your life, or are you afraid . . . that whatever you
> do and however you vote, you are going to have
> PTSD or something like that?

Juror 35 indicated she thought she would be all right long-term but then disclosed that she would "have to submit some questions about the law that" she needed "some clarification on" and expressed concern about "reading [the answer] without . . . asking . . . questions back" because often one answer raised another question but the responses came too "slowly." The trial court assured her that it would quickly respond to any appropriate legal questions presented from the jury room and said it sounded like she just "needed a break." The trial court sent Juror 35 to lunch and suggested that she was "just experiencing" the "terrible stress of a difficult decision."

¶13   But after lunch, Juror 35 sent another question to the trial court asking, "Can I be dismissed from this case? I believe this will severely affect me in the future mentally." The trial court invited both counsel "to be heard as to whether or not we excuse . . . Juror No. 35, and allow Juror No. 36 to take [her] place." The State opined that "if we don't replace her, it's going to be an appealable issue." The court agreed. After taking a moment to discuss and consider the issue, defense counsel stated that "a decision to allow her to remove herself . . . is probably the better course." The trial court expressed its "main concern" as "whether or not she can continue deliberations without doing violence to her own personal health, and also to [Nunez's] rights to a fair trial." The State indicated willingness to speak with her once more and defense counsel then said that "for purposes of the record, it might be better to talk to her." Ultimately, the trial court and both counsel determined to speak once more with Juror 35.

¶14    At the outset of the second conversation, the trial court reminded the juror, "You can't talk about what's going on in there. Just about you." The juror expressed, "I feel like how I feel in there I can't think clearly or like express my opinions openly." The trial court then invited both counsel to present questions to the court that it could then present to Juror 35, and in so doing emphasized, "Whether [continuing to deliberate] would affect her in the long run is a very, very important issue. . . . [B]ut [Nunez] and the State have the right to . . . a jury that will deliberate and will participate in deliberations. If she will not or cannot do that, that's a Constitutional issue." The court then explained to Juror 35,

> [M]aybe the most important issue . . . in the . . . judicial system's point of view is that we have eight individuals in there, each one using their full brain, their full willpower, their full articulation, their full ability to express themselves. . . . [W]e want people to work towards an agreement . . . if they can without doing violence to their own conscience. So understanding [that] . . . can you be all in and 100 percent there, or are you withdrawing or no longer participating in the deliberations?

¶15    Juror 35 again struggled to fully express her concerns without describing the deliberations. The court began to ask yes or no questions:

> Q: Do you feel like you can deliberate with the other jurors and speak your mind?
>
> A: Yes and no.
>
> Q: Tell me why the no, again without divulging any specific opinions.

A: Okay, so I don't think this would divulge any opinions, but I feel like I'd be interrogated . . . as to my opinion, and like a little bit—I feel a little bit badgered in there. So like I don't want to change an opinion because of that, and I don't know if I'm required as a juror to like how much I have to explain to the other jurors of why I stand where I do, because I feel like I've done that, but [the questioning has] just continued—

. . . .

Q: Well, as it's continued have you shut down to the point that you're no longer responding or answering your fellow jurors and participating in that discussion? Have you receded from it now?

A: I'm starting to shut down from before.

. . . .

A: I don't like want to leave, but I feel like if I stay, the situation I don't know—I'm sorry.

Q: Okay, then we can move onto the other question, then. I can tell you're in pain and emotional, and I thank you.

. . . .

Q: Do you currently have any sort of struggle suffering from incidents that occurred previously? Are you—is one of your issues where you'll continue to dwell on or suffer from events that happened in the past?

A: Yes.

Q: Is that part of what you're being [medically] treated for now?

A: Yes.

. . . .

Q: But nevertheless, that is one of the issues you struggle with, is suffering from events that have happened in the past. Are you concerned that this may be one of those events that will cause you to suffer in the future?

Juror 35 said she believed this event would cause her to suffer in the future if she "ha[d] to go back in there and keep having questions like that asked of [her]." Shortly thereafter, the trial court excused Juror 35 so it could confer with both counsel about the situation.

¶16　Defense counsel summarized how he saw the situation, stating,

She seems to be doing what we want a juror to do, and that is to maintain her own opinion to the point that she feels intimidated by I don't know how many, but at least some. As a human being, it seems hard to send her back in there, frankly. As an attorney, I think I have to take the position that she's doing what she's supposed to do.

¶17　The State made similar observations, stating, "I don't want her to change her opinion just because she's being badgered. But being badgered and feeling uncomfortable is not necessarily grounds to dismiss her as a juror." The court and both counsel then discussed providing the jury a potential *Allen*

charge or an alternative-opinion respect admonishment.[2] The court then summarized its own view:

> I don't know what's going on. There's a chance she's a hold-out for conviction. There's a chance she's [a] hold-out for acquittal. There's a chance of anything. But if, whatever we do, if we keep her on that jury, and in 15 minutes they come back with a conviction, I don't want—you're going to think there's an appealable issue there because we left her on too long.
>
> . . . .
>
> And yet, if we take her off the jury, and [Juror No. 36] comes in, and in 15 minutes there's a conviction, then there's another appealable issue. So I just want . . . to think it through clearly. I want the least appealable issue. . . . We've had at least a few questions about being hung. We've had her ask to be excused twice. . . . She's doing her job. *My problem is if she stops doing her job.* And she stops doing it because she's fatigued, and she's tired, and she's emotionally unfit. I don't want that creating an appealable issue . . . .

(Emphasis added.) Defense counsel requested five minutes to discuss and consider the matter with Nunez, and the court recessed for that purpose.

---

2. An *Allen* charge consists of "supplemental jury instructions to help a deadlocked jury reach a unanimous verdict." *State v. Cruz*, 2016 UT App 234, ¶ 10, 387 P.3d 618 (cleaned up); *see also State v. Ginter*, 2013 UT App 92, ¶ 4 n.2, 300 P.3d 1278; *Allen v. United States*, 164 U.S. 492, 501–02 (1896).

¶18    After the recess, the court noted that the alternate juror had arrived and that Juror 35 was "not going back [into the jury room] without some sort of arm-twisting." At that point, the State took the position "that we allow her to be dismissed and we go with the alternate juror." Defense counsel, after having used the recess to consider the issue and discuss it with Nunez, took a similar position, stating, "I believe that Mr. Nunez, and his father, and both counsel agree that under the circumstances expressed, that she be released." The court then discharged Juror 35. The court proceeded in asking the alternate juror if he had "complied with the admonition . . . to not discuss the facts of this case with anybody until the Bailiff informed [him] that the resolution or a verdict [could] be reached?" The alternate juror responded "Yes. I will comply," and the court invited him to join the other jurors.[3]

---

3. We note that the alternate juror had been retained but temporarily excused, and had been instructed, until otherwise notified, to continue to comply with the admonition not to discuss the case with anybody. We also note that requesting an alternate juror to return after being excused constitutes an unusual circumstance. But here, both counsel affirmatively represented their consent to replace Juror 35 with the alternate and Nunez has not made this aspect of the handling of the jury a point of contention in his brief; thus, we need not comment on this issue. *See* Utah R. Crim P. 18(f) (providing that "[t]he court may retain alternate jurors after the jury retires to deliberate," that "[t]he court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged," and that "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew"); *cf. State v. Gollaher*, 2020 UT App 131, ¶ 24 n.4, 474 P.3d 1018 (noting that jurors may be replaced "*after* deliberations have begun" but that nothing expressly

(continued…)

¶19    To that point, not to mention breaks and times when the jurors could not deliberate because Juror 35 was unable, the deliberations had lasted around ten hours. Following the alternate juror's appointment, the jury deliberated for about two and a half more hours before reaching a unanimous verdict convicting Nunez on all counts.

¶20    Nunez appeals the convictions.

ISSUES AND STANDARDS OF REVIEW

¶21    Nunez raises numerous arguments for our review. First, Nunez contends that the trial court erred in admitting, over objection, Kiara's CJC interview. Nunez also contends that, although he failed to preserve the issue, the court plainly erred in admitting Kiara's CJC interview without applying Utah Rule of Criminal Procedure 15.5's procedural rigors and, alternatively, that defense counsel provided ineffective assistance in failing to request that the court formally follow rule 15.5's procedure before admitting Kiara's CJC interview. Nunez further contends that defense counsel provided ineffective assistance in failing to object to the CJC interviewer's testimony about the interview protocol.

¶22    Second, Nunez contends that the court erred in admitting Witness's testimony. Nunez also contends that the court erred in excluding Nunez's proffered impeachment evidence against Witness.

¶23    Third, Nunez contends that defense counsel provided ineffective assistance in inviting Nunez to testify as to the

_____

(…continued)
permits "courts to reseat alternates after they have been discharged").

foundation for Witness's testimony and in withdrawing the motion to strike portions of that testimony.

¶24    Fourth, Nunez contends that the court plainly erred in failing to sua sponte enter a directed verdict of acquittal based on the insufficiency of the evidence. Alternatively, Nunez contends that defense counsel provided ineffective assistance in failing to move for a directed verdict on the same basis.

¶25    Fifth, Nunez contends that the court plainly erred in failing to sua sponte remedy alleged prosecutorial misconduct during closing argument. Alternatively, Nunez contends that defense counsel provided ineffective assistance in failing to object to that alleged prosecutorial misconduct.

¶26    Sixth, Nunez contends that the court plainly erred in failing to adequately discuss Juror 35's concerns and in dismissing Juror 35. Alternatively, Nunez contends that defense counsel provided ineffective assistance in failing to request more in-depth discussions with Juror 35 and in agreeing to Juror 35's dismissal instead of objecting or seeking a mistrial.[4]

¶27    As to this catalogue of claimed error, we apply these standards of review. We review the trial "court's decision to admit or exclude evidence" for abuse of discretion. *Northgate Village Dev., LC v. City of Orem*, 2019 UT 59, ¶ 14, 450 P.3d 1117 (cleaned up). To show plain error, Nunez "'must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful.'" *State v. Popp*, 2019 UT App 173, ¶ 35, 453 P.3d 657 (quoting *State v. Johnson*, 2017 UT 76,

---

4. Nunez also contends that the cumulative effect of numerous errors undermines confidence in the fairness of his trial. However, because we identify no error throughout our analysis, we do not reach this argument. *See State v. Darnstaedt*, 2021 UT App 19, ¶ 19 n.4, 483 P.3d 71.

¶ 20, 416 P.3d 443). And to succeed on an ineffective assistance claim, Nunez "must show that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and that he "was prejudiced thereby," *State v. Kennedy*, 2015 UT App 152, ¶ 23, 354 P.3d 775 (cleaned up).

ANALYSIS

¶28 Although Nunez argues that the trial court erred in admitting certain evidence and that the court plainly erred or defense counsel provided ineffective assistance in relation to Kiara's testimony and Witness's testimony, among other evidentiary issues, when we review the record, we see a trial court rendering well-reasoned decisions and committing no obvious error and defense counsel pursuing a number of reasonable strategies indicative of effective assistance. With this in mind, we discuss each claim of error in turn.

I. Kiara's Testimony

¶29 Nunez contends that the court plainly erred, and that defense counsel provided ineffective assistance, by failing to ensure that, before admission, the CJC interview met the requirements of Utah Rule of Criminal Procedure 15.5, which governs out of court statements of child victims of sexual abuse. However, contrary to Nunez's assertions, if a statement made by a child witness in an out-of-court interview is independently admissible under some other rule of evidence or procedure, litigants need not satisfy rule 15.5 to have that statement admitted. *See State v. Hoyt*, 806 P.2d 204, 209 (Utah Ct. App. 1991). This is because "[t]he rule is permissive, not exclusive," *see id.*, and some evidence that falls under the purview of rule 15.5 may nevertheless appropriately be admitted pursuant to other rules of evidence and procedure, *State v. Burke*, 2011 UT App 168, ¶ 52 n.13, 256 P.3d 1102 (reading *Hoyt*, 806 P.2d at 209, as

standing for the proposition "that rule 15.5 is not the exclusive method through which a child's testimony may be admitted"). Because the statements at issue here were admissible pursuant to Utah Rule of Evidence 801(d)(1)(A), the State did not need to satisfy rule 15.5 to have the statements admitted. Accordingly, we conclude that the court did not plainly err, nor did defense counsel render ineffective assistance in connection with the admission of Kiara's testimony.[5]

A.     Plain Error

¶30     To prevail on a plain error argument, Nunez must first show that "an error exists." *State v. Popp*, 2019 UT App 173, ¶ 35, 453 P.3d 657 (quoting *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d

---

5. Nunez also contends that the court erred in admitting *any part* of Kiara's CJC interview. But we agree with the State that any error was actually invited. "[A] party who, without having objected to a proposed course of action, affirmatively represents that they have no objection to it, invites any resulting error"— and this is the case here. *See Cruz*, 2016 UT App 234, ¶ 20. Defense counsel objected to the CJC interview generally under Utah Rule of Evidence 403 (which allows the exclusion of relevant evidence for various reasons). Nunez's brief notes this point in passing but does not develop a discussion of this point and the record shows that the court bypassed a discussion of the CJC interview's admissibility under rule 403 in favor of discussing its admissibility under Utah Rules of Evidence 613 and 801(d)(1)(A). And regarding the CJC interview's admission on these grounds, defense counsel raised no objection and instead assisted the court in working out the logistics of ensuring that the State excise appropriate parts of the video, *see* Utah R. Evid. 801(d)(1)(A), and ensuring Kiara had the opportunity to explain or deny the CJC interview's contents, *see* Utah R. Evid. 613; *see also supra* ¶ 31. In this regard, any error was invited.

443). As stated, rule 15.5 is permissive, meaning that an out-of-court child-witness statement *can* potentially be admitted into evidence through that rule but that the rule by no means constitutes the only mechanism by which such testimony may be admitted. *See Hoyt*, 806 P.2d at 209. When an appellant's argument relies on the trial court's failure to comply with a rule that we have deemed permissive, that appellant faces an uphill battle to show plain error. Other than arguing that rule 15.5 was not applied, and by implication maintaining that application of rule 15.5 is mandatory, Nunez does not explain how the trial court's failure to engage with rule 15.5 constituted an obvious error. And our precedent's holding that rule 15.5 is permissive, coupled with Nunez's failure to point to any Utah precedent holding application of rule 15.5 mandatory, undermines a conclusion that obvious error occurred.

¶31    Nunez also asserts that the prosecutor could not properly seek admission of the entire CJC interview under Utah Rule of Evidence 801(d)(1)(A), which allows, as non-hearsay, admission of a declarant's out-of-court inconsistent or forgotten statements. However, in this assertion Nunez neglects to acknowledge that the trial court, in response to defense counsel's objections, did actually limit what parts of the CJC interview the State could show to the jury, requiring it to break the interview into four parts to prevent, to the extent possible, prior *consistent* statements from also coming in. Thus, Nunez does not show that the court erred by admitting the CJC interview through rule 801(d)(1)(A) rather than rule 15.5.[6]

---

6. Nunez also contends that the State inappropriately used Utah Rule of Evidence 613, which governs extrinsic evidence of witnesses' prior inconsistent statements, to further justify the CJC interview's admission. However, far from justifying admission with rule 613, the court actually ruled that admission

(continued…)

B.      Ineffective Assistance of Counsel

¶32    To prevail on an ineffective assistance of counsel claim, Nunez must first show that defense counsel provided deficient representation that "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350 (cleaned up). In making this determination, we "consider[] all the circumstances" to determine whether the representation was "objectively unreasonable." *Id.* ¶ 36. While doing so, we "indulge in a strong presumption that counsel's [approach] fell within the wide range of reasonable professional assistance, and that under the circumstances, the challenged action might be considered sound trial strategy." *State v. J.A.L.*, 2011 UT 27, ¶ 25, 262 P.3d 1 (cleaned up).

¶33    Nunez does not meet this threshold requirement. First, because rule 15.5 is permissive, defense counsel's failure to require the court to conduct a rule 15.5 analysis is not dispositive in showing ineffective assistance; as discussed above, *supra* ¶¶ 29–31, rule 801(d)(1)(A) allowed the court to admit the portions of the CJC interview played for the jury, and therefore defense counsel could reasonably have concluded that raising a rule 15.5 challenge would have been futile, *see State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis . . . ."). Moreover, a consideration of all the circumstances suggests that defense counsel's choice to avoid rule 15.5 constituted a sound trial strategy. Here, defense counsel

---

(…continued)

would be contingent on complying with rule 613 by requiring Kiara to be on the stand to be given a chance to explain or deny the CJC interview's contents. In short, we see no abuse of discretion in the court's application of rule 613 as concerns the CJC interview.

knew the trial court had reviewed the interview's contents at the preliminary hearing when it bound the case over for trial. At that hearing, the parties extensively argued whether the CJC interview justified the bindover, and ultimately, the court determined that it did. Considering this history, defense counsel could have reasonably believed that even if the court had adhered to rule 15.5's procedural requirements, it would have admitted the interview video into evidence. Had the interview survived the rule 15.5 process—and based on the courts preliminary hearing ruling that was likely—the entire interview (rather than just portions of it) would have been entered into evidence and seen by the jury. *See* Utah R. Crim. P. 15.5(a). This situation presented defense counsel with two alternatives: attempt to press for compliance with the permissive rule 15.5 and risk the likely outcome of having the entire interview shown to the jury, or allow only the inconsistent interview sections to come in as the court had ordered. Presented with these alternatives, defense counsel could reasonably have decided to allow portions of the interview to prevent it from coming into evidence in its entirety.[7]

---

7. Nunez also contends that the CJC interviewer inappropriately bolstered Kiara's credibility by testifying that the interview protocol requires interviewers to get the child "to promise to tell the truth." Nunez argues that counsel rendered ineffective assistance by failing to object. But counsel does not render ineffective assistance by withholding a futile objection. *State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025; *State v. Burdick*, 2014 UT App 34, ¶ 34, 320 P.3d 55. And here, we determine that any objection on this basis would have been futile. True, "admission of testimony that bolsters the credibility of another witness's testimony on a particular occasion is improper." *State v. Lewis*, 2020 UT App 132, ¶ 21, 475 P.3d 956. But the record does not support the proposition that the CJC interviewer

(continued…)

## II. Witness's Testimony

### A. Trial Court Treatment

¶34 Nunez contends that Witness offered "incompetent" testimony that should have been excluded under Utah Rules of Evidence 403 and 602. Nunez also argues that the court abused its discretion in excluding his proposed impeachment testimony. We disagree.

### 1. Admission of Witness's Testimony

¶35 Referencing Utah Rules of Evidence 403 and 602, which govern, respectively, exclusion of irrelevant evidence and the need for a witness's personal knowledge, Nunez contends that Witness's testimony failed to reach minimum thresholds of knowledge, relevancy, competence, clarity, and concision. But the record does not bear this out. In describing what she remembered about her time in the home together with Nunez and Kiara, Witness testified of her experiences as a percipient witness, which by its nature requires personal knowledge. Further, by digging into the issue about whether Witness would testify about events that took place in Utah, the trial court expended significant effort to ensure that Witness's testimony focused only on the relevant charges and would therefore have probative value. While Witness's testimony may not have been

(…continued)

improperly bolstered Kiara's credibility. The CJC interviewer did nothing more than testify as to the interview protocol; a protocol that required her to obtain a promise from the child that the child would tell the truth. The fact that the protocol contained such a requirement, and that the witness testified about it, in no way means that the CJC interviewer testified about whether Kiara testified honestly or credibly on that particular occasion.

as precise, direct, clear, or pointed as would have most benefited the State, these shortcomings go to the testimony's weight, not its admissibility and, indeed, may have given defense counsel ammunition with which to combat the State's evidence.[8] We conclude the court did not exceed its discretion when it allowed Witness to testify.

2.      Excluding Impeachment Evidence

¶36     Nunez also takes issue with the trial court excluding certain evidence he would have used to allegedly impeach Witness. However, we conclude that the court did not exceed its discretion in excluding the evidence pursuant to Utah Rule of Evidence 403.

¶37     Nunez sought to offer evidence of hostility between Nunez and his ex-wife, Witness's mother, but did not address this evidence with Witness or her mother when they were on the stand. The trial court researched the issue independently and, in excluding the evidence, relied on *State v. Cox*, 826 P.2d 656 (Utah Ct. App. 1992), and Utah Rule of Evidence 403.

¶38     In *Cox*, the defendant cross-examined a witness and only later sought to challenge that witness's credibility by offering evidence of bias showing that the witness testified against the defendant to receive prosecutorial leniency. *Id.* at 661. When the trial court excluded that evidence and the defendant appealed, we clarified that although a defendant can impeach a witness for bias, "the right of cross-examination is limited by Utah Rule of Evidence 403." *Id.* We then recited rule 403, explained that "[t]he proponent of evidence offered to show bias must lay a foundation for the evidence," and held that because no independent foundation had been laid, the proffered evidence

_____

8. As noted below, *infra* ¶ 43, counsel used this testimony for that very purpose—to impeach Kiara.

was too speculative for its proposed purpose and because the subject was not approached when the witness was on the stand, it was also "potentially unfairly prejudicial,"—thus, exclusion was within the trial judge's discretion. *Id.* at 661–62.

¶39    Here, the trial court noted that after Witness had left the stand, Nunez, like the defendant in *Cox*, tried to offer evidence under Utah Rule of Evidence 608(c) to show bias on Witness's part. The trial court articulated its view that Nunez desired to offer the testimony to suggest that animosity between Nunez and his ex-wife (Witness's mother) implied that Nunez's ex-wife would lie if lying would hurt Nunez, that this implication, in turn, would further imply that Nunez's ex-wife would then encourage Witness to lie, and that all these inferences would then imply that Witness did actually lie on the stand. *See supra* ¶ 8. Relying on Utah Rule of Evidence 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," the court excluded the evidence, declaring that it was "too far removed from the facts that [were] relevant to this case." The trial court indicated that Nunez had offered no independent foundation "to show that any of the alleged hostility between [the ex-wife and Nunez] was actually communicated to [Witness]" and that, to the contrary, Witness had testified that "she had some fond feelings for [Nunez]." Thus, because "[a]ny feelings she may have had or motives she had to lie were not explored and she was not impeached while she was on the witness stand, . . . an attempt to impeach her [after the fact] behind her back and through" another witness was "perhaps even more unfairly prejudicial" than the situation in *Cox.* The court further stated that "[i]f this evidence were admitted, this trial over [Kiara's] alleged abuse would become about [Witness's parents'] divorce litigation, and that would be an inappropriate hijacking of this trial. It would confuse the issues. It would mislead the jury and

it would waste their time." Ultimately, the court declared that "insufficient foundation [had been] laid to go now one or two steps removed from [Witness] to try to now use that [evidence] to impeach her" and that the "evidence [was] both inadmissible under 403 and 608."

¶40 The court's reasoning shows that, in context, the proposed evidence's speculative nature rendered its probative value low in comparison to its substantial potential for unfair prejudice, confusing the issues, misleading the jury, and wasting the jury's time. Thus, the trial court did not exceed its discretion in excluding this proposed impeachment evidence.

B.  Defense Counsel's Decisions

¶41 Relatedly, Nunez contends that defense counsel provided ineffective assistance by putting Nunez on the stand to discuss foundation for Witness's testimony, including the layout of the home in Utah versus a different residence in Wyoming (which resulted in the court's finding that Witness's testimony had sufficient foundation) and by choosing to withdraw his motion to strike portions of Witness's testimony to pursue an alternative strategy. Again, Nunez's arguments do not show that defense counsel performed deficiently.

¶42 Nunez takes issue with defense counsel's decision to put Nunez on the stand when discussing the layout of the home Witness referred to in her testimony. Nunez characterizes this as "the defense laying the foundation where the State was unable." But "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Here, it appears that defense counsel put Nunez on the stand, not to lay foundation on the State's behalf, but in an attempt to thwart that foundation through testimony from Nunez that could clarify that Witness was not, in fact, testifying about the home in Utah, but the home in Wyoming.

That defense counsel's strategy backfired and resulted in the trial court declaring that foundation had been laid is not dispositive of deficient performance. "The question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Gallegos*, 2020 UT 19, ¶ 36, 463 P.3d 641 (cleaned up). "[E]ven where a court cannot conceive of a sound strategic reason for counsel's challenged [approach], it does not automatically follow that counsel was deficient." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. But here, viewed "in the real-time context of trial," *see Gallegos*, 2020 UT 19, ¶ 36 (cleaned up), we can conceive a sound strategic reason for defense counsel's approach—attempting to thwart the foundation for Witness's testimony—and we conclude that the strategy was objectively reasonable even though the outcome differed from defense counsel's desires.

¶43 Defense counsel's decision to withdraw the motion to strike Witness's hearsay statements is also objectively reasonable under a similar analysis. While Nunez argues that this decision was "inexplicabl[e]," we view the approach as unremarkable. Witness's testimony regarding Kiara's statements directly contradicted Kiara's own account. Without Witness's testimony that Kiara reported that Nunez had threatened to hurt her and others if she told anyone about the abuse, defense counsel would have been unable to point out the inconsistency found in the CJC interview, in which Kiara indicated Nunez had never made such threats. *See supra* ¶ 7. Defense counsel told the court unequivocally that this was part of a specific strategy when he said, "we compromised some issues and addressed the matter in a different fashion." Indeed, defense counsel's strategy was so obvious that the trial court responded, "Right. That's what I could tell." Having identified a "reasonable strategy" behind defense counsel's actions, we conclude that Nunez "has

necessarily failed to show unreasonable performance." *See Ray*, 2020 UT 12, ¶ 34.

### III. Sufficiency of the Evidence

¶44  Nunez contends that the State failed to present "substantial reliable evidence," (cleaned up), sufficient to support the convictions. Nunez concedes he has not preserved this contention and argues that the court plainly erred by failing to grant a directed verdict sua sponte. Alternatively, Nunez argues that defense counsel rendered ineffective assistance by failing to seek a directed verdict on these same grounds.

### A.    Plain Error

¶45  To support his plain error argument, Nunez argues that Kiara "gave no direct testimony recounting the elements of the five charged offenses" and that the State could not rely on the CJC interview to establish the missing elements because the evidence is "of a substantially lesser quality" under *State v. Ramsey*, 782 P.2d 480 (Utah 1989). Nunez asserts that under these evidentiary circumstances, the court erred in submitting the case to the jury. But after a closer examination of the applicable caselaw, we conclude that Nunez has not established that an error occurred.

¶46  In *Ramsey*, the defendant allegedly forced his son to simulate intercourse with his daughter. 782 P.2d at 482–83. However, "an out-of-court hearsay statement," later denied on the stand by the alleged declarant, provided the allegation's "only probative evidence." *Id.* Thus, the *Ramsey* court had to determine if the charge could "be supported solely by the . . . unsworn out-of-court statement." *Id.* at 483. Ultimately, that court held that "a conviction that is based entirely on a single, uncorroborated hearsay out-of-court statement that is denied by the declarant in court under oath cannot stand." *Id.* at 484.

¶47    *Ramsey* is distinguishable from this case for three reasons. First, this conviction was not based entirely on a single statement—Witness's testimony and medical expert testimony corroborated the CJC interview's contents. Second, setting aside the State's additional evidence, the court admitted the CJC interview into evidence as a non-hearsay statement under Utah Rule of Evidence 801(d)(1)(A)—thus, the statement did not constitute hearsay. Third, and most distinguishable from *Ramsey*, Kiara never denied the CJC interview's contents. And both *State v. Seale*, 853 P.2d 862 (Utah 1993), and *State v. Stricklan*, 2020 UT 65, 477 P.3d 1251, make it clear: these characteristics constitute material distinguishing features.

¶48    In contrast to *Ramsey*, in *Seale*, the defendant faced various charges, including charges for sexual abuse. *Seale*, 853 P.2d at 865, 874–76. For one victim, the "only affirmative evidence supporting [the defendant's] convictions for the aggravated sexual abuse of" that victim was the videotape of the victim's interview with a social worker. *Id.* at 865, 876. Specifically distinguishing *Ramsey*, the *Seale* court declared that "the videotaped interview [was] sufficient to sustain [the defendant's] convictions" because the victim "did not deny or recant what she told the interviewer in the videotape." *Id.* at 876. "Because the [interview] was appropriately admitted as substantive evidence, the jury was fully entitled to weigh the credibility of [the victim's] videotaped statements and her testimony on the stand against [the defendant's] . . . testimony and to decide who was telling the truth." *See id.*

¶49    Further, in *Stricklan* our supreme court addressed *Ramsey* head-on stating,

> Although we speak of . . . *Ramsey* establishing a "rule" that a single uncorroborated, out-of-court statement cannot sustain a conviction, it is a rule that does very little analytical work. . . . [Rather],

> we do what we always do when a defendant seeks
> to set aside [a] conviction arguing insufficient
> evidence: we review all of the evidence before the
> jury to see if it dispels reasonable doubt of the
> defendant's guilt. . . . [W]here the out-of-court
> statement is accompanied by additional persuasive
> evidence, . . . sufficient evidence may exist to
> uphold the conviction.

2020 UT 65, ¶ 60.

¶50    Here, the jury heard persuasive evidence in addition to the interview, including: Kiara's testimony on the stand, Witness's testimony, and evidence of Kiara's relevant medical examinations. Under these circumstances, the CJC interview's credibility was the jury's to weigh, *see Seale*, 853 P.2d at 876, as the "trier of fact is in a superior position to assess credibility" and can "look at all of the evidence presented to it," *Stricklan*, 2020 UT 65, ¶¶ 71, 99.

¶51    So, when presented with a sufficiency of the evidence argument, the question before us is a totality consideration: given the evidence the jury properly received, warts and all, could the jury have reasonably come to a conviction beyond a reasonable doubt? *See Id.* ¶ 82. In *Seale*, an undenied, out-of-court, non-hearsay statement, uncorroborated by other evidence, could, independently, sufficiently support a conviction. 853 P.2d at 875–76. Thus, here, an undenied, out-of-court, non-hearsay statement, *corroborated* by other evidence, necessarily suffices to support the convictions.

¶52    Accordingly, the trial court did not plainly err in declining to, sua sponte, render a directed verdict in Nunez's favor based on insufficiency of the evidence.

B.     Ineffective Assistance of Counsel

¶53     For similar reasons, Nunez's ineffective assistance claim also misses the mark. Nunez argues that defense counsel rendered ineffective assistance by failing to move for a directed verdict after the State had presented its evidence. "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467. Based on the reasoning described above, defense counsel could have reasonably concluded that Kiara's CJC interview alone could sufficiently support the charges, never mind that the jury would be considering other corroborating evidence by way of Witness's testimony and the medical exam evidence. Having been able to reasonably determine that the evidence could support a jury verdict, defense counsel cannot have rendered ineffective assistance by withholding a futile motion. *State v. Baer*, 2019 UT App 15, ¶ 14, 438 P.3d 979 ("[C]ounsel . . . did not render ineffective assistance in failing to raise a futile motion."); *see also State v. Burdick*, 2014 UT App 34, ¶ 34, 320 P.3d 55 ("It is well settled that counsel's performance at trial is not deficient if counsel refrains from making futile objections, motions, or requests." (cleaned up)); *State v. Johnson*, 2015 UT App 312, ¶ 16, 365 P.3d 730.

IV. Prosecutorial Misconduct

¶54     Nunez next contends that the court plainly erred in failing to remedy, or that defense counsel rendered ineffective assistance in failing to object to, alleged prosecutorial misconduct during closing argument. However, both claims fall short on their merits, as the prosecutor committed no misconduct, and thus, the court had nothing to remedy and defense counsel had nothing to object to.

¶55     During closing argument,

counsel for each side has considerable latitude and may discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom. However, a prosecutor's actions and remarks constitute misconduct that merits reversal if the actions or remarks call to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial. In determining whether a given statement constitutes prosecutorial misconduct, the statement must be viewed in light of the totality of the evidence presented at trial.

*State v. Wright*, 2013 UT App 142, ¶ 39, 304 P.3d 887 (cleaned up). Here, each statement that Nunez complains about survives scrutiny as an evidence-supported inference the prosecutor could permissibly draw for the jury.

¶56   First, Nunez takes issue with the prosecutor's comments that Kiara struggled to testify on the stand while suggesting that this difficulty could have resulted from the passage of time. This comment did not improperly vouch for Kiara or assert personal knowledge about the evidence and, in making the comment, the prosecutor raised no matters that the jury could not properly consider. Instead, the prosecutor argued that time could have dimmed Kiara's memory and pointed out a critical distinction that "incomplete" testimony is not the same as "inconsistent" testimony.

¶57   Second, Nunez argues that the prosecutor improperly referenced the CJC interviewer's testimony in reiterating that the interview protocol purposefully sought to "elicit details" and "accurate information from a child" by requiring "stages and steps . . . all done in an effort to get a good, reliable, honest,

detailed statement from the child." Again, this was not new evidence, improper vouching, an assertion of personal knowledge, or personal opinion about whether he thought the CJC interviewer or Kiara told the truth. The prosecutor simply reminded the jury of what it heard directly from the CJC interviewer's testimony.

¶58 Lastly, Nunez complains that the prosecutor referenced matters not in evidence and uncorroborated unreliable statements when he commented that Kiara "was repeatedly abused" and "repeatedly raped" and that "maybe [Kiara] had those many times confused." However, where the State charged Nunez with multiple counts of rape of a child and multiple counts of sodomy on a child stating that Kiara "was repeatedly abused" and "repeatedly raped" goes no further than the charges' elements would require—that the conduct occurred more than once; in other words, repeatedly.

¶59 Because the prosecutor engaged in no misconduct, the court cannot have erred by failing to intervene and defense counsel cannot have rendered ineffective assistance by declining to object.

V. Jury Deliberations

¶60 Finally, we examine Nunez's claims surrounding Juror 35's replacement. Nunez asserts that the court plainly erred by restricting Juror 35 from describing in more detail the challenges she faced in the jury room, by failing to recognize a deadlocked jury, and by failing to declare a mistrial. Nunez also asserts that defense counsel rendered ineffective assistance in failing to object to the court's refusal to allow Juror 35 to report in more detail the challenges she faced in the jury room and failing to object to Juror 35's dismissal.

¶61 However, on close review of the record and the difficulties all parties, the attorneys, and the court faced in this

instance, we conclude that any court error was invited and that defense counsel rendered objectively reasonable, effective assistance.

A.     Plain Error

¶62     In dealing with Juror 35 and her issues with deliberations, the court recognized the difficulty of the situation and discussed with both counsel how to proceed. Each time Juror 35 entered chambers to discuss the issue with the court and both counsel, defense counsel affirmatively requested that she be invited in to discuss the issues.

¶63     During the discussions that followed, Juror 35 tried to abide by the court's instruction that she not tell the court about the jury deliberations, including what was discussed, who said what, what she had said, how she felt about the evidence or the verdict, or anything else about what was going on in the jury room. *See supra* ¶¶ 11, 14. Indeed, her comments revealed little about what was going on in the jury room or where the deliberations actually stood. While Juror 35 clearly experienced emotional distress that derived from sharing her opinions in the jury room, nothing she said suggested she was the only holdout, either for conviction or acquittal, or that removing her would essentially direct a verdict. The jury had asked the court, "If the jury is hung, what is the next step?" and, "Are we able to have a verdict on some counts and be hung on other counts?" Juror 35 also expressed, "I'm experiencing some anxiety . . . being in the situation that I am in," "I feel like how I feel in there I can't think clearly or like express my opinions openly," and, "I feel like I'd be interrogated . . . as to my opinion, and . . . a little bit badgered in there." But the court recognized that Juror 35 did not actually reveal anything about the potential outcome of the deliberations when it later said, "I don't know what's going on. There's a chance she's a hold-out for conviction. There's a chance she's [a] hold-out for acquittal. There's a chance of anything." And after

taking time specifically to discuss this particular issue with Nunez and his father, defense counsel represented to the court, "I believe that Mr. Nunez, and his father, and both counsel agree that under the circumstances expressed, that she be released."

¶64 According to the record, defense counsel (1) requested that the court restrict Juror 35 from discussing the deliberations' content and (2) specifically agreed that she be released after discussing it with Nunez. Thus, without deciding if an error actually occurred, we conclude that the court cannot have committed any error—plain or otherwise—because defense counsel invited any potential error.

¶65 "[W]e have traditionally found invited error when the context reveals that counsel independently made a clear affirmative representation of the erroneous principle." *State v. McNeil*, 2016 UT 3, ¶ 18, 365 P.3d 699. "[I]f the trial court—not counsel—is responsible for leading a courtroom discussion into error, any resulting error is not invited." *Id.* ¶ 19. However, "a party who, without having objected to a proposed course of action, affirmatively represents that they have no objection to it, invites any resulting error." *State v. Cruz*, 2016 UT App 234, ¶ 20, 387 P.3d 618. Here, the court suggested that inviting Juror 35 to discuss the issue with certain restrictions, and ultimately releasing Juror 35, could be one way of dealing with the situation; defense counsel not only did not object to the proposed course of action, but instead affirmatively represented that the defense agreed both to restricting Juror 35's deliberation discussions and to ultimately releasing Juror 35. Thus, because any error was invited, plain error does not apply.[9] *See id.*

---

9. Nunez also contends that the trial court inappropriately restricted Juror 35's deliberation descriptions because Utah Rule of Evidence 606 "prohibits a juror's testimony *post-verdict*" and does not limit "disclosures sought to be made by a juror pre-

(continued…)

(indicating that the appellate court may decline to engage in plain error review when the error is invited).

B.     Ineffective Assistance of Counsel

¶66    Once again, Nunez fails to make a threshold showing that defense counsel performed deficiently because the record before us provides manifold reasons that could justify defense counsel's course of action. Nunez asserts that defense counsel rendered ineffective assistance by failing to object to the court's restrictions on Juror 35's deliberation discussions and by failing to object to Juror 35's dismissal. However, as we have pointed out, defense counsel, far from objecting to both of these courses of action, actually requested them. So, the question becomes "Why?"—a question directly related to answering the ineffective assistance analysis's first prong.

¶67    First, we cannot conclude that defense counsel unreasonably failed to object to the court's restriction on Juror 35's comments. It is "the long-established policy of the law to keep jury deliberations both secret and sacrosanct." *State v. Thomas*, 830 P.2d 243, 249 (Utah 1992) (Stewart, J., concurring); *accord Cornia v. Albertson's*, 397 P.2d 66, 67 (Utah 1964) ("After the jurors have retired to deliberate their privacy is sacrosanct."

_____

(…continued)
verdict and during trial." But Nunez has provided no authority suggesting that rule 606(b)'s focus on post-verdict inquiry overrides substantial legal authority generally restricting inquiry into deliberations. *See infra* ¶ 67. And where rule 606(b) explicitly governs proceedings "[d]uring an inquiry into the validity of a verdict," *see* Utah R. Evid. 606(b), we do not believe, and Nunez cites no authority to suggest, that this prohibition necessarily negates other legal authority or otherwise invites a trial court to freely inquire into ongoing jury deliberations.

(cleaned up)); *see also Johnson v. Maynard*, 342 P.2d 884, 888 (Utah 1959) ("[T]he privacy of the jury room should be preserved from influence from outside sources or any semblance thereof."); *Clark v. United States*, 289 U.S. 1, 13 (1933) ("Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world."). Defense counsel's action, in requesting the court to restrict Juror 35's description of the deliberations, comports with this well-known legal principle. Moreover, Nunez has provided no support in rule or caselaw for his proposition that defense counsel should have, or even could have, foregone compliance with such a well-known legal principle in these circumstances. We conclude that it was not objectively unreasonable for defense counsel to act in accordance with this well-established legal principle. Thus, having not shown that "counsel's representation fell below an objective standard of reasonableness," Nunez's ineffective assistance claim falls short on this point. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

¶68 Second, we also conclude that defense counsel acted reasonably in stipulating to the release of Juror 35 and replacing her with the alternate juror as a matter of sound strategy. After the second discussion with Juror 35, defense counsel requested a five-minute recess to discuss the issue with Nunez and his father. And, coming back from recess, defense counsel affirmatively stated, "I believe that Mr. Nunez, and his father, and both counsel agree that under the circumstances expressed, that she be released." Clearly, defense counsel did not suddenly make a decision without considering it or discussing it. Rather, this decision's context shows that it was a reasoned, strategic choice that came after conversation and consideration.

¶69 The record provides ample justifications for a strategy that allowed Juror 35 to be released. As an initial matter, we note that Kiara had essentially failed to effectively testify at trial,

forcing the State to rely on other evidence to establish the charges' elements and to corroborate that evidence. In addition, the jury had already been in active deliberations around ten hours over the course of two days and had asked questions such as, "If the jury is hung, what is the next step?" and "Are we able to have a verdict on some counts and be hung on other counts?" Moreover, nothing suggested that Juror 35 acted as the only holdout. This timeline and these questions could suggest to a reasonable defense attorney that things may have been headed the client's way. An attorney, acting reasonably, could decide not to throw away the opportunity to keep a jury wrestling over the State's case. Requesting a mistrial would have done exactly that. *See United States v. Dinitz*, 424 U.S. 600, 607 (1976) ("Where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." (cleaned up)).

¶70    And keeping Juror 35 on the jury could have been equally as detrimental. Indeed, defense counsel's interactions with Juror 35 could have persuaded him as much. For instance, during their discussion, Juror 35 confirmed that she "struggle[d] suffering from incidents that occurred previously," that she "continue[d] to dwell on or suffer from events that happened in the past," and that she believed this event could cause her to suffer in the future. From this, defense counsel could reasonably have guessed or inferred that certain of the trial's contents could have negatively triggered Juror 35 and that these feelings and emotions she was experiencing would be detrimental to Nunez's case. Indeed, for all defense counsel knew at the time, Juror 35 could have been the lone holdout for conviction; as the trial court correctly stated, "I don't know what's going on. There's a chance she's a hold-out for conviction. There's a chance she's [a] hold-out for acquittal. There's a chance of anything."

¶71    But even if we posit that Juror 35 *was* the lone holdout for an acquittal, defense counsel still could have reasonably acceded to her being removed as a juror. Referring to the deliberations, Juror 35 explicitly stated, "I feel a little bit badgered in there. So like I don't want to change an opinion because of that, and I don't know if I'm required as a juror to like how much I have to explain to the other jurors of why I stand where I do, because I feel like I've done that, but [the questioning has] just continued" and that she was "starting to shut down from before." Based on this, a reasonable attorney could seek to remove her from the jury to avoid the risk that she tired of the fight and resigned her opinion to match the others. If defense counsel discerned that Juror 35 was likely to change her opinion because she was tired or badgered, the scope of reasonable representation would certainly allow replacing the risky juror in favor of a fresh mind who might put up more of a fight.

¶72    "Appellate courts have upheld the dismissal and replacement of jurors whose physical or mental condition prevented them from effectively participating in deliberations," even when the "infirmity as a juror could have been triggered or exacerbated by . . . disagreement with the other jurors." *Perez v. Marshall*, 119 F.3d 1422, 1427 (9th Cir. 1997) (collecting cases). So too here, defense counsel did not perform deficiently in allowing Juror 35 to be replaced when she appeared to be emotionally unable to continue in the deliberations.

¶73    Defense counsel did not provide ineffective assistance in allowing the court to replace Juror 35 with an alternate or in declining to seek a mistrial. Multiple considerations could have persuaded defense counsel, and indeed Nunez himself (as he was part of the discussion with defense counsel that led to the decision), that replacing Juror 35 would be an appropriate trial strategy and that pursuing a mistrial could be detrimental to his cause.

CONCLUSION

¶74 The court did not exceed its discretion in admitting Kiara's CJC interview, and the court did not plainly err, nor did defense counsel provide ineffective assistance, regarding its admission. Further, the court did not exceed its discretion in admitting Witness's testimony or in excluding Nunez's proposed impeachment evidence, nor did defense counsel render ineffective assistance in dealing with Witness's testimony. Sufficient evidence existed to support the verdict, and as a result, the court did not plainly err in failing, sua sponte, to enter, nor did defense counsel provide ineffective assistance in declining to request, a directed verdict. In addition, the alleged prosecutorial misconduct presented no error that obligated either the court or defense counsel to act. Finally, we conclude that defense counsel invited any error the court made in restricting Juror 35's comments or in ultimately dismissing Juror 35, and in that process, defense counsel did not render ineffective assistance through the pursued legal strategy.

¶75 Accordingly, we affirm Nunez's convictions.

———————