**2024 UT App 86**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL IGNATIUS KUFRIN,
Appellant.

Opinion
No. 20210499-CA
Filed June 6, 2024

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 171402277

Emily Adams, Freyja Johnson, and Melissa Jo
Townsend, Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      After a thirteen-day trial, a jury convicted Michael Ignatius Kufrin of murdering his girlfriend, Peggy Sue Case (Peggy), in 1988. Kufrin appeals that conviction, asserting that the trial court should have declared a mistrial after one of the State's witnesses mentioned that Kufrin had "previous cellmates"; that the court improperly admitted expert testimony from the medical examiner (Examiner) regarding timelines for stages of body decomposition; and that his trial attorneys rendered constitutionally ineffective assistance by not lodging a particular objection to testimony from Peggy's coworkers about the status of her relationship with Kufrin at the time of her disappearance. For the reasons set forth, we reject all of Kufrin's arguments and affirm his conviction.

## BACKGROUND[1]

*Peggy's Mysterious Disappearance*

¶2 On Saturday, July 9, 1988, Peggy and Kufrin—a romantically involved couple who resided together—attended, along with some of Peggy's coworkers, a company barbeque and a follow-on "hot tub party." Some people at the events noticed something off about Kufrin. One person thought that Kufrin "was maybe the only person there that wasn't having fun." Others noted that he appeared "angry-looking," was not very social, and spent his time "kind of in the distance." Peggy, on the other hand, "was having a good time" and was at times seen in the hot tub socializing with some other men. At around 11:00 p.m., Peggy and Kufrin left the party together, accompanied by no one else. That was the last time anyone other than Kufrin saw Peggy alive.

¶3 On the following Monday, Peggy did not show up to work. Her office did receive an explanation for her absence, though; Kufrin called in that day and explained that Peggy was unable to come to work because she was "going up to Salt Lake to look at a car." Meanwhile, Peggy's family was worried and thought Peggy might be missing; Peggy's sister went over to Peggy and Kufrin's residence that evening and saw Kufrin outside "watering the lawn." Peggy's sister observed that Kufrin was nervous—so nervous, in fact, "that the water in his hand was shaking." Concerned, Peggy's sister asked Kufrin where Peggy was. Kufrin responded, "Well, she's gone," and he explained that Peggy had gone "to Reno to get a car."

---

1. In an appeal from a jury trial, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," and we "present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Speights*, 2021 UT 56, n.1, 497 P.3d 340 (quotation simplified).

¶4     Over the next few days, Kufrin called Peggy's office at least two more times to explain her absence. In these later calls, Kufrin told Peggy's coworkers that Peggy "wasn't feeling well" and therefore couldn't come to work. One of Peggy's coworkers was concerned, and she called Peggy's telephone number; Peggy did not answer, but the coworker heard a message on Peggy's answering machine that Kufrin had recorded, apparently intended for Peggy. In the message, Kufrin stated, "If you have any more trouble with the car, call the friends in Sparks and they will come and get you, and then I will come and get you."

¶5     By Friday, police had started an investigation into Peggy's disappearance. Officers interviewed Kufrin, and he said that Peggy "had gone with [a friend] to Reno" to buy "a 1986 silver Honda Prelude." (That friend would later testify that she did not go on a trip with Peggy to Reno.) Kufrin also said that he had last seen Peggy on Sunday but that he had spoken with her on both Tuesday and Thursday. According to Kufrin, Peggy told him during one conversation that she was in Lake Tahoe and was on her way to see her brother who was serving a religious mission in California, and that she would be back by Monday. (That brother would later testify that Peggy never went to see him.)

¶6     Starting Monday, officers regularly checked the residence where Kufrin and Peggy lived to see if a new car was parked out front, which would perhaps signify that Peggy had come home. But every time they went by, they saw no new car. During a Tuesday visit, police knocked on the door. Kufrin answered, and he said that Peggy had come home. He pointed to a blue duffle bag that he claimed Peggy used while traveling, and he explained that Peggy had gone to pick up her paycheck and that she would be back at the house soon. (That paycheck was never picked up.) He then promised that when Peggy came home, he would tell her to go over to the police station.

¶7 Over the course of the investigation, officers discovered that Kufrin had been telling different stories to different people about where Peggy was and what had happened to her. At trial, the State presented testimony from many witnesses about the various accounts—in addition to the ones already discussed—that Kufrin gave, including the following:

- A neighbor testified that, on the day after the hot tub party, Kufrin said that Peggy had "got[ten] drunk and left" the party "with a couple of her coworkers" and would call him in a few days and then come home.

- A coworker testified that, three days after the party, Kufrin said that Peggy had gone to get a car because she was mad that Kufrin "wouldn't marry her."

- A friend testified that, sometime in 1988, Kufrin said that the "cops" were "accusing him of killing Peggy" and that she had left Utah to go buy a car.

- Another friend testified that, sometime during the week of Peggy's disappearance, Kufrin said that Peggy "needed to get away for a few days and that she had gone out of town."

- That same friend also testified that, near the end of July, Kufrin said that Peggy had come home for a night and that "he had to send her back . . . to California" where she was either "getting a job or had got one."

- A neighbor testified that, sometime at the end of July or in early August, Kufrin said that "Peggy had been in contact with him and that she had an RV and they were going to meet somewhere and then leave from there."

- One of the friends also testified that, sometime in 1988, Kufrin said that Peggy "was at a motel in Nephi, but

she was not allowed to talk to anybody per her lawyer's advice."

- That same friend also testified that, sometime in 1988, Kufrin said that he had just taken Peggy up to Park City, that they were "going to get married," and that they wanted the friend to be a witness at the wedding.

¶8 Kufrin's claim that he and Peggy were going to get married was one that Peggy's friends and coworkers found "surpris[ing]." Prior to her disappearance, Peggy had told one coworker that she was "dissatisfied" and "unhappy," and that she was "looking for a more committed relationship" with "someone who could plan with her . . . for her life and her future." She had left another coworker with the "impression" that she "wanted to improve her situation." One of Peggy's friends told police that Peggy had "decide[d] that she wanted more out of her relationship with" Kufrin and that if Kufrin "didn't set some goals and have more ambition, she was going to leave him." A neighbor also testified that before Kufrin moved in with her, Peggy "seemed happy," but that after Kufrin moved in, Peggy "became very withdrawn" and "wouldn't communicate at all."

¶9 In August 1988, the police searched Kufrin's trash. In it, they found a "ripped-up photograph" of Peggy, as well as a torn-up tendered check from Peggy's account. The check was dated one month after Peggy's disappearance and was made out to Kufrin in the amount of $100, and it bore a suspicious-looking signature. Police also found one of Peggy's bank statements, also torn up, which indicated that the check made out to Kufrin had effectively drained Peggy's account.

¶10 With this new information in hand, police obtained a warrant to search the residence Kufrin had shared with Peggy. The police utilized both human officers as well as dogs (referred to as K9s) in this search of the premises, but the K9s used in the search were not trained and certified as "cadaver dogs." During

the initial search, which took place in early September, police searched not only the house but also a "root cellar" located at the back of the property.[2] This search of the root cellar was conducted by both officers and a K9, and they found nothing of interest in this first search of the root cellar.

¶11 In October, about a month after this initial search, Kufrin moved out of the residence. But despite his relocation, neighborhood rumors continued to run rampant that Peggy had been murdered and buried somewhere on the premises. In an attempt to quell these rumors, officers contacted the owner of the premises and obtained "permission to go under the house and around the yard and look for Peggy." Officers (this time without a K9) again searched the root cellar, and this time they "spaded" the dirt floor with a shovel, although they did not go "more than two spades deep in any one spot." Officers again found nothing.

¶12 Police interviewed Kufrin again in January 1989. In that interview, Kufrin stated that the last time he saw Peggy was at the

---

2. A "root cellar" is generally defined as "a structure, usually underground or partially underground, used for storage of vegetables, fruits, nuts, or other foods," and the "name reflects the traditional focus on root crops stored in an underground cellar." *See Root Cellar*, Wikipedia, https://en.wikipedia.org/wiki/Root_ce llar [https://perma.cc/3NB8-WXJP]. In this case, though, the "root cellar" was not located underground. Instead, it was located entirely on ground level; it had concrete walls, a concrete roof, and a dirt floor, and it required an average-sized person to crouch down in order to enter. As depicted at trial, it was located away from the house at the back of the property and was about ten feet wide, eight feet long, and, once past the entryway, less than six feet high. Even though this structure—essentially, an above-ground concrete storage shed—does not entirely comport with the general definition of "root cellar," we use that term in this opinion because that is the term the witnesses used to describe it.

hot tub party at around midnight. He also claimed that Peggy had later returned with a new car but that he never saw her. And he said he delivered a cedar chest to her location in California, but he declined to give the police "a specific location or a person that [they] could confirm that with."

¶13    After that, for nearly three decades, the case went cold.

*The Discovery of Peggy's Body*

¶14    In 2012, a new tenant (Tenant) moved into the residence where Peggy and Kufrin had lived in 1988. He used the root cellar in the backyard for storage. When Tenant moved in, he found a table and a five-gallon bucket of concrete in the root cellar that he considered too heavy to move, so he placed his items around the table and bucket. As he was doing so, he noticed that the dirt floor underneath the table was "concave" and exhibited "a definite depression," and it made him wonder whether something might have been buried there that had decayed. But Tenant took no further action at that time.

¶15    A few years later, in 2016, Tenant was having a conversation with a neighbor—who happened to be a former police officer—about construction of a retaining wall along the boundary between their respective properties. While talking, the neighbor told Tenant about Peggy's disappearance and mentioned that "[h]er body [had] never been found." Half-jokingly, the neighbor pointed at the root cellar and said, "Maybe she is in there." This caused Tenant to think of the concave depression he had observed in the floor of the root cellar, and he told the neighbor, "Well, I know where she is at." Tenant then took the neighbor to the root cellar and showed him the depression. Because of the heavy table and bucket, they did not dig into the root cellar's floor that day. But Tenant resolved to dig into the floor later, when he moved from the property.

¶16    About a year later, in May 2017, Tenant was about to move out of the residence, and he asked a friend to help him move. After they moved Tenant's belongings out of the root cellar, they decided to dig into the root cellar's floor where the depression was. About eighteen inches down, they found a blanket, and after cutting a hole in the blanket they eventually found what looked like a "skull." At that point, Tenant and his friend "ran out of the building" and contacted police.

¶17    Officers soon arrived and conducted an excavation of the root cellar, and they were eventually able to identify the remains as Peggy's. The blanket was identified as one that Peggy's mother and sister had made for her decades earlier and that Peggy had kept in her house. Officers also found a black tank top and black shorts at the scene, which were the exact clothing Peggy had been wearing at the hot tub party in July 1988. Investigators were also able to use dental records to identify the remains as Peggy's.

¶18    After examining the remains, investigators ruled Peggy's death a homicide, and they specifically found that she had sustained "sharp force trauma," likely from "a bladed instrument" forcefully inserted into her ribcage. Peggy also had a fractured bone in her neck, a fact that suggested she had been strangled. Examiner eventually determined that Peggy died from strangulation and "sharp force" injuries.

¶19    Investigators also determined that the root cellar was not the first place that Peggy's body had been interred. Peggy's hair was not located anywhere in the root cellar, a fact that suggested that Peggy's body had been "moved from the place where she was initially left" and that her "body had undergone some decomposition prior to moving to [her] final resting place."

¶20    Officers tested the items found in the root cellar—including the blanket and clothing—for DNA, but the results of this testing were inconclusive and could neither confirm nor exclude Kufrin as a possible contributor.

¶21 Police eventually obtained an arrest warrant for Kufrin, then located him and interviewed him in July 2017, more than twenty-eight years after their last interview with him. In this interview, Kufrin claimed that Peggy "ran away from home" after the hot tub party, and he stated that he had nothing to do with her disappearance.

*The Trial*

¶22 After completing its investigation, the State charged Kufrin with murder. Eventually, the case proceeded to a thirteen-day jury trial. Tenant testified about finding Peggy's body. Various law enforcement officers testified about the investigation. Some of Peggy's coworkers and friends testified about the hot tub party and about their communications with Kufrin. A forensic anthropologist testified about Peggy's injuries. And Examiner testified about what he thought caused Peggy's death. Three parts of the State's evidence are especially relevant to this appeal, and we discuss these parts in more detail.

¶23 First, the State asked some of Peggy's coworkers and friends to offer testimony about their perceptions of Peggy's relationship with Kufrin. During trial, Kufrin objected to the admission of this testimony, and his objection was largely based on hearsay grounds (although at one point Kufrin asserted that the testimony was "not helpful to the trier of fact"). The court entertained argument on these objections, and the attorneys debated whether and to what extent various hearsay exceptions applied to the testimony. The court largely overruled Kufrin's objections, although it did exclude one statement and cautioned the State against offering others. The State then introduced the evidence already described. *See supra* ¶ 8. At no point did Kufrin ask the trial court to exclude this evidence pursuant to rule 403 of the Utah Rules of Evidence.

¶24 Second, the State presented testimony from Examiner regarding Peggy's remains. Relevant here was the testimony that

Peggy's hair was not found in the root cellar, leading investigators to conclude that Peggy had initially been buried somewhere else. In particular, the State previewed, during its opening statement, that Examiner would testify that it was possible for Peggy's scalp and hair to have detached from her skull, due to partial decomposition of the body, "in a matter of days, if not a few weeks, at most," after her death. Such evidence was important to the State because Kufrin moved out of the residence in October 1988, some three months after Peggy's disappearance, and it was important for the State to establish that Peggy's reburial—without scalp and hair—in the root cellar could have taken place at some point less than three months after her death.

¶25 Kufrin objected to Examiner's proffered testimony that the "scalp slippage" could have occurred within just a few days or weeks after Peggy's death. Kufrin's objection was grounded in rule 702 of the Utah Rules of Evidence. The court held an evidentiary hearing, in the middle of the trial but outside the jury's presence, to consider Kufrin's objection. Examiner was present and testified at that hearing, and he was questioned by counsel for both sides as well as by the court directly.

¶26 During that hearing, Examiner testified that during his career, he had done about 5,000 postmortem exams, about one-third of which had involved at least "mild to moderate . . . stages of decomposition." He testified that he had "seen bodies at every stage of decomposition" during the course of his career. His knowledge about body decomposition and scalp slippage came not only from his own experience but also from consulting with "other seasoned pathologists in [his] office." He discussed his familiarity with studies done at "body farms down in Tennessee"—which he considered to be "fairly reliable"—where "they essentially subject corpses to different conditions" to learn about how decomposition works. He also offered his view that "empirical data is available from time immemorial when people—scientists and laypeople would observe . . . bodies that

were left in . . . different conditions." Based on this knowledge and experience, he concluded that Peggy's "body had undergone some decomposition prior to moving to [her] final resting place."

¶27 With regard to timing, Examiner noted that in the typical situation, where "the body is intact and buried, the hair remains with the body," and he reiterated that, "without manipulation, . . . the scalp hair doesn't slough [off] on its own." But he explained that, once the body has begun to reach even "the initial stages of decomposition," the "hair can slip off with minimal physical disturbance of the body with the scalp." And he opined that the decomposition processes, "given enough time," will "undermine the scalp to the point [that] when [a] body is disturbed, the scalp hair sloughs off," and that "under the right conditions" this could occur "within a matter of days or weeks." Examiner acknowledged that he was unaware of "any studies that are unique to the state of Utah or conditions that you see in the state of Utah," and that conditions in other parts of the country—due to humidity—could be different from Utah. Later, in front of the jury, he explained that the fastest time frame he had observed "from last seen alive to full skeletonization happened . . . in [a case in] Georgia," in which "the whole decomposition process" happened "within 12 to 14 days."

¶28 The court then made a lengthy oral ruling overruling Kufrin's objection to Examiner's testimony. The court noted the "large body of experience and knowledge" underlying Examiner's testimony, and it observed that Kufrin would be calling a competing expert on the same topic (body decomposition and scalp slippage). In this situation, the court concluded that both experts would be allowed to offer their opinions on the matter and that Examiner's testimony was "appropriate as opinion testimony for the jury to help understand, appropriately, from two different and possibly opposing witnesses, when this event might have transpired." Later, in front of the jury and in accordance with the court's

ruling, Examiner testified that it would have been possible for Peggy's scalp and hair to have separated from her body during reburial if the body had been moved at least "days to maybe a week or week-and-a-half, two weeks" after her death.

¶29     Third, one of the State's law enforcement witnesses mentioned—apparently inadvertently—during his testimony that, during the investigation, he had spoken with some of Kufrin's "previous cellmates." The State had come into the trial with the belief that "it would be error to" introduce Kufrin's prior criminal history to the jury, and it had apparently made at least some effort to educate its witnesses, before testifying, not to mention anything about Kufrin having been previously incarcerated. But despite those efforts, a mishap occurred. While the State was examining the lead detective in the 2017 investigation, it asked, "Since that arrest in July of 2017 what else have you done to further this investigation?" The detective responded as follows:

> Well, at that point, um, obviously I had been in contact with the county attorney's office, the prosecution. I followed up on any leads or requests that they may have had, whether it was—you know, I went back and interviewed maybe previous cellmates or family members or talked to [Kufrin's] mother and just any leads that—some of this had also hit the media. We'd get phone calls randomly. Just any leads we may or may not have had from people . . . just randomly calling.

At that point, Kufrin's counsel asked for a sidebar, which request the court granted, even though it later commented that, in the moment, it "didn't know what the issue was." During the sidebar, Kufrin's counsel asked the court to declare a mistrial, asserting that the witness's reference to "previous cellmates" had "suggest[ed] to the jury" that Kufrin "has a criminal record and a

history of being an inmate in jail or prison," which counsel asserted "is a prejudicial statement . . . of character evidence." The State opposed the motion, and it cited some cases to the court as support for its position. The court noted that it was a Friday afternoon, and it declined to immediately rule on the motion for a mistrial; instead, it gave the parties the opportunity to submit additional authorities, and it indicated that it would revisit the matter on Tuesday morning when the trial reconvened.

¶30 On Tuesday morning, the court indicated that it had read all the cases the parties had mentioned on Friday and in addition had read "some others that are cited in those cases." The court heard extensive oral argument from counsel, and then took a recess until lunchtime so that it could compose a written decision on the matter. When the court reconvened, it read aloud a written decision it had composed that morning, in which it denied Kufrin's motion for a mistrial. The court noted that the State had not intentionally elicited the witness's comment, that it had been made only in passing, and that it was relatively "innocuous because it was only two words in a trial that has already lasted seven days and is less than half over." The court specifically determined that the detective's reference to "previous" cellmates was "not unduly prejudicial."

¶31 After the court's ruling, the trial continued, and it lasted six more days. Eventually, the State rested its case, and Kufrin then presented five witnesses in his defense, including the following: a soil scientist who noted that some of the soil found inside the blanket was not from the root cellar, and who agreed with the State's investigators that Peggy had initially been buried somewhere else; a dog handling expert who testified about the abilities of cadaver dogs and dogs generally, and who opined that even a non-cadaver dog would likely have exhibited "an alert behavior of some level" in the root cellar during the September 1988 search; and a forensic pathologist who offered his own opinions about body decomposition and scalp slippage. The

pathologist testified that Examiner's timeline—that Peggy's body could have experienced scalp slippage in "as little as a few days and at most a few weeks if the remains were disturbed or manipulated"—was "a little fast," especially for Utah's low humidity conditions. He offered his view that it would take "[a]t least weeks to months" for scalp slippage upon reburial to be possible "in a Utah grave," but he agreed on cross-examination that a "mechanical intervention like a hand pulling it" could "speed up the process" and result in scalp and hair removal "even though the natural process hadn't run its full course."

¶32 After deliberation, the jury found Kufrin guilty. Later, the court sentenced Kufrin to a prison term of five years to life.

ISSUES AND STANDARDS OF REVIEW

¶33 Kufrin appeals his conviction, and he raises three issues for our consideration. First, he challenges the trial court's decision to deny his motion for a mistrial. We "review the denial of a motion for a mistrial under an abuse of discretion standard," *State v. Sorenson*, 2023 UT App 159, ¶ 10, 542 P.3d 529 (quotation simplified), and "we will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial," *State v. Suhail*, 2023 UT App 15, ¶ 70, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

¶34 Second, Kufrin challenges the trial court's decision to permit Examiner to offer timeline testimony regarding scalp slippage. We review a "trial court's determination regarding the admissibility of expert testimony" for "abuse of discretion." *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186. Under this standard, "we will not reverse unless the decision exceeds the limits of reasonability." *Id*. (quotation simplified).

¶35    Finally, Kufrin asserts that his trial attorneys rendered ineffective assistance by not lodging a rule 403 objection to testimony about Peggy's relationship with Kufrin. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (quotation simplified), *cert. denied*, 525 P.3d 1254 (Utah 2022).

ANALYSIS

I. Mistrial Motion

¶36    First, Kufrin asserts that the trial court abused its discretion by denying his motion for a mistrial, made after the lead detective mentioned that Kufrin had "previous cellmates." While we agree with Kufrin that this remark was unfortunate, we discern no abuse of discretion in the trial court's determination that the remark did not warrant a mistrial.

¶37    "A mistrial is strong medicine." *State v. Whytock*, 2020 UT App 107, ¶ 16, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021); *see also State v. Roberts*, 2019 UT App 9, ¶ 15, 438 P.3d 885 ("Declaring a mistrial is a particularly drastic remedy that is warranted only when no reasonable alternatives exist." (quotation simplified)), *cert. denied*, 440 P.3d 694 (Utah 2019). And in this context, we afford "a high level of deference" to a trial court's decision "because trial courts are in an advantaged position to determine the impact of courtroom events on the total proceedings." *Whytock*, 2020 UT App 107, ¶ 17 (quotation simplified). Accordingly, "we will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quotation simplified).

¶38 Our supreme court, after reviewing Utah appellate decisions in this area, has noted that "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *Id*. ¶ 40; *see also State v. Butterfield*, 2001 UT 59, ¶ 47, 27 P.3d 1133 (finding no abuse of discretion in the denial of a mistrial where the improper testimony was not intentionally elicited and was "vague" and "fleeting"); *State v. Decorso*, 1999 UT 57, ¶ 39, 993 P.2d 837 (finding no abuse of discretion in the denial of a mistrial where the improper testimony was "vague" and where "the proceedings . . . move[d] along without undue interruption" following the testimony), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Three cases, in particular, are especially relevant, not only because those cases present factual situations similar to the one presented here, but also because they illustrate the "high level of deference" we afford trial courts in this context. *See Whytock*, 2020 UT App 107, ¶ 17.

¶39 In *State v. Wach*, a defendant was accused of assaulting and kidnapping his mother, and the court made a pretrial ruling that no evidence of the defendant's previous bad acts would be admitted. 2001 UT 35, ¶¶ 2, 19, 24 P.3d 948. During the mother's testimony, she volunteered information that implied that the defendant may have previously assaulted her. *Id.* ¶ 19. The defendant moved for a mistrial, but the court denied the motion. *Id.* ¶¶ 20–21. Our supreme court affirmed, saying that the statement "was not elicited by the prosecutor, and was an isolated, off-hand remark, buried in roughly 244 pages of testimony," and concluding that the "isolated remark . . . did not render [the] trial so unfair that the trial court was plainly wrong in denying" the motion. *Id.* ¶ 46 (quotation simplified).

¶40 A few years later, in *Allen*, our supreme court held that a court had not abused its discretion in denying a motion for a mistrial when one of the State's witnesses made an unsolicited reference to the defendant being asked to "come in for a lie

detector test." 2005 UT 11, ¶¶ 36, 43 (quotation simplified). In analyzing the situation, the court listed six reasons that supported its decision to affirm: (1) the prosecutor did not intentionally elicit the statement; (2) the reference was "vague" and did not indicate that the defendant had passed or failed any lie detector test, only that he had been asked to take one; (3) the "reference was brief"; (4) after the statement, "the proceedings continued without undue interruption"; (5) the State brought "no further attention" to the statement; and (6) the trial court offered to give a curative instruction, which offer the defendant declined. *See id.* ¶ 43.

¶41 More recently, in *Whytock*, we held that a court had not abused its discretion in denying a motion for a mistrial after one of the State's witnesses "volunteered," without being asked, that she had "got [the defendant] out on ankle monitor to her dad's house from the Salt Lake County jail." 2020 UT App 107, ¶¶ 10, 49 (quotation simplified). The defendant asserted that this comment had prejudiced him by implying that he had a criminal history. *Id.* ¶ 15. We agreed with the defendant "that the statement should not have come into evidence," but we nevertheless concluded that, under the circumstances, the court had not abused its discretion in refusing to declare a mistrial. *Id.* We noted that the State had not intentionally elicited the statement, that it had been made "in passing," and that the State "made no further mention of [the defendant's] criminal history generally or of [the witness's] statement in particular." *Id.* ¶ 24.

¶42 These cases are quite similar to the instant case, and they compel the same result. As in these other cases, the detective's statement here was made in passing, it was not intentionally elicited by the State, and the State made no further mention of it— or of any criminal history Kufrin might have had—at any point in the trial. We also note the ambiguous nature of the brief two-word allusion and thus credit the trial court's determination that the statement was "relatively innocuous" in the overall context of the trial. The jury would have known that Kufrin was arrested in July

2017 after Peggy's body was discovered; in this context, a reference to "cellmates" would not necessarily have triggered an assumption that Kufrin had an unrelated criminal history. And it is worth noting that the trial judge himself—who listened to the statement in the moment—was unaware, until Kufrin's counsel explained his motion, that a potentially inadmissible statement had been uttered. As in the other similar cases, the trial court's refusal to declare a mistrial was not an abuse of its discretion.

¶43 Kufrin resists this determination on two basic grounds. First, he focuses on the word "previous" and asserts that the reference to "previous cellmates" had to have referred to pre-2017 cellmates and not to cellmates Kufrin had following his arrest for Peggy's murder. We do not interpret the reference in quite the same way as Kufrin does; in our view, it is quite possible that the jury simply assumed the reference to be to post-arrest cellmates. But even assuming, for purposes of the discussion, that the reference was clearly one to pre-arrest cellmates and thus clearly implied that Kufrin had a previously undisclosed criminal history, that would not change our analysis. The statement was made in passing, was unsolicited, and was never again mentioned during the course of the thirteen-day trial. As illustrated by *Whytock*—where the reference to criminal history was much clearer than this one—a trial court retains discretion, depending on the circumstances, to determine whether even direct references to inadmissible criminal history warrant a mistrial. *See id.* For the reasons already discussed, the trial court did not abuse that discretion here.

¶44 Second, Kufrin directs our attention to two other cases that he believes compel reversal, but these cases are distinguishable. In *State v. Courtney*, the defendant was on trial for drug crimes, and a potential juror stated, during voir dire in front of the entire jury panel, that she knew the defendant from her "years in law enforcement" and explained that she had had "affiliations with" the defendant "during the time that [the potential juror] was

serving as an agent for the Weber-Morgan Narcotics Strike Force." 2017 UT App 62, ¶ 2, 415 P.3d 604. The court denied a motion for a mistrial, and we reversed, finding an abuse of discretion given the type of charges in the case and the direct implication that the defendant had a history of criminal drug charges. *See id.* ¶¶ 23–24 (noting that the comment "suggested that [the defendant] had repeatedly had some involvement in the type of crimes he was on trial for"). Such concerns are not present here, where the comment about "previous cellmates" contained no implication that Kufrin had ever had involvement in any type of violent crime, let alone the specific type of crime (murder) involved here.

¶45    Kufrin also directs our attention to *State v. Craft*, in which a police detective stated—unsolicited and in passing—that the defendant's codefendants had said the defendant was present at the scene of the crime. 2017 UT App 87, ¶ 13, 397 P.3d 889. The defendant's "entire defense" was that he hadn't been present, and he had successfully moved, prior to trial, to sever his trial from his codefendants' "for the very purpose of avoiding the introduction . . . of incriminating statements made by his codefendants." *Id.* ¶ 26. The offending statements thus directly implicated the defendant; in that context, we determined that counsel had rendered ineffective assistance by not moving for a mistrial. *Id.* ¶ 33. But the context here is materially different: the detective's statement did not directly implicate Kufrin in the commission of the very crime in question.

¶46    Thus, this case is much more like *Wach*, *Allen*, and *Whytock* than it is like *Courtney* and *Craft*. Under the circumstances here, we discern no abuse of discretion in the trial court's determination that the detective's statement was relatively innocuous in the context of this thirteen-day trial, and we thus conclude that the trial court did not abuse its discretion in its decision to deny Kufrin's motion for a mistrial.

## II. Examiner's Testimony

¶47   Next, Kufrin contends that the trial court abused its discretion by allowing Examiner to offer expert testimony that included a possible timeline within which body decomposition and scalp slippage could have occurred. We discern no abuse of discretion in the court's ruling.

¶48   We begin our analysis with a discussion of the particulars of Examiner's testimony. In this regard, it is important to note that the timeline opinion Kufrin challenges did not concern an undisturbed body at rest; rather, Examiner's opinion had to do with time frames within which it might be possible, given progressing decomposition, for a "disturbed" or "manipulat[ed]" body to have its scalp and hair "slip off" during a reburial process. Indeed, Examiner clarified that his opinion "presupposes some . . . external physical disturbance to the body." And Examiner did not offer any opinion about when scalp slippage *must* have occurred; rather, his opinion was couched in terms of when it would have been "possible" for scalp "slippage to have occurred." So, to sum up, the opinion that is here challenged by Kufrin amounted to this: that the scalp and hair slipped off of Peggy's body when her body was moved, and that it would have been "possible," due to progressing body decomposition, for this to have occurred as early as "maybe a week or week-and-a-half, two weeks" after her death.

¶49   Kufrin challenged the admissibility of this opinion under rule 702 of the Utah Rules of Evidence. That rule allows "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). But in order for expert testimony based on "[s]cientific, technical, or other specialized knowledge" to be admissible, the proponent of that

evidence must make "a threshold showing that the principles or methods" used "(1) are reliable, (2) are based on sufficient facts or data, and (3) have been reliably applied to the facts." *Id.* R. 702(b); *see also State v. Lopez*, 2018 UT 5, ¶ 20, 417 P.3d 116.

¶50    Kufrin does not challenge Examiner's qualifications or the general helpfulness of Examiner's testimony. Instead, Kufrin asserts that the State failed to make the "threshold showing" that Examiner's timeline testimony on "scalp slippage" was reliable and based upon sufficient facts or data. In support of this assertion, Kufrin claims that Examiner's opinion was based entirely on "his observation of *one* drowning death in Georgia," and argues therefrom that "[o]ne anecdotal example is not 'sufficient facts or data.'" And Kufrin further claims that Examiner's "principles and methods" were not "reliably applied to the facts" of this case, because Examiner had not adequately accounted for how Utah's weather and atmospheric conditions might differ from more humid environments. We find Kufrin's assertions unpersuasive.

¶51    Examiner's opinion was based on much more than one isolated drowning death in Georgia. To be sure, Examiner used that case as one example in which he had seen "full skeletonization" occur "within 12 to 14 days" after death. But Examiner's opinions about when it would be *possible* for a disturbed body to experience scalp slippage were based on much more than just this one example. As already noted, at the evidentiary hearing, Examiner testified that he had done some 5,000 postmortem exams, about one-third of which had involved at least "mild to moderate . . . stages of decomposition," and that this experience had allowed him to see "bodies at every stage of decomposition." He further stated that his knowledge about body decomposition and scalp slippage came not only from his own experience but also from consulting with "other seasoned pathologists in [his] office," as well as from familiarity with "fairly reliable" studies done at "body farms down in Tennessee" where

"they essentially subject corpses to different conditions" to learn about how decomposition works. He also referenced "empirical data . . . from time immemorial when people—scientists and laypeople would observe . . . bodies that were left in . . . different conditions." And during his testimony in front of the jury, he mentioned that he had done "a literature search" on the topic. Examiner's opinion was thus based on far more than just one isolated example, and Kufrin's argument to the contrary is unsupported by the record.

¶52 Next, we acknowledge Kufrin's point that some of the facts and data forming the basis for Examiner's opinion came from places like Tennessee and Georgia, where environmental conditions might be materially different from those in Utah. But we do not see this as something that, in this situation, would disqualify Examiner from offering his opinions; instead, this point is something that can readily be (and was) explored during cross-examination and that goes to the weight of the testimony rather than its admissibility. *See Alder v. Bayer Corp.*, 2002 UT 115, ¶ 60, 61 P.3d 1068 (stating that "opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of [an] expert's testimony," do not "preclude admission of the expert's testimony—they go to the weight, not the admissibility" of the testimony (quotation simplified)); *see also Eskelson v. Davis Hosp. & Med. Center*, 2010 UT 59, ¶ 12, 242 P.3d 762 (stating that the "degree of scrutiny that should be applied to expert testimony by trial judges is not so rigorous as to be satisfied only by scientific or other specialized principles or methods that are free of controversy or that meet any fixed set of criteria fashioned to test reliability" (quotation simplified)).

¶53 Finally, we note that Kufrin's own expert offered scalp-slippage timeline testimony that was, in important ways, not all that different from Examiner's testimony. When asked about it, Kufrin's expert opined that Examiner's timeline was "a little quick for a Utah grave," but even he acknowledged that scalp slippage

upon body disturbance could have occurred within "weeks to months" of death, a timeline that could still allow for reburial to have occurred before October 1988. Under these circumstances, the trial court did not abuse its discretion when it overruled Kufrin's objection and allowed Examiner to offer expert opinion regarding possible time frames for scalp slippage to have occurred upon disturbance of Peggy's body. We therefore reject Kufrin's argument to the contrary.

### III. Ineffective Assistance of Counsel

¶54 Kufrin's final argument is an assertion that his trial attorneys rendered ineffective assistance by not lodging a particular objection—one grounded in rule 403 of the Utah Rules of Evidence—to testimony from Peggy's friends and coworkers about their perceptions of her relationship with Kufrin. We reject this argument because Kufrin has not carried his burden of demonstrating that his attorneys performed deficiently by not making that objection.

¶55 To succeed on his ineffective assistance of counsel claim, Kufrin must demonstrate both (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense" so as to "deprive the defendant of a fair trial." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Kufrin must make a successful showing on both elements; indeed, if "either is lacking, the claim fails and this court need not address the other." *State v. Ames*, 2024 UT App 30, ¶ 17, 546 P.3d 356 (quotation simplified), *cert. denied*, No. 20240319 (Utah May 24, 2024).

¶56 In our view, Kufrin's claim fails on the deficient performance prong. That part of the test requires Kufrin to show that his counsel's performance "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See id.* ¶ 35 ("To be

sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶57 In the specific context presented here—where a defendant contends that his trial attorney performed deficiently by not lodging a particular objection—Utah appellate courts have often stated that an attorney does not perform deficiently if lodging the objection in question would have been a futile exercise. *See, e.g.*, *State v. Ring*, 2018 UT 19, ¶¶ 43, 47, 424 P.3d 845 (holding that, where "counsel could have reasonably believed that an objection was futile," counsel did not perform deficiently by not lodging that objection); *State v. Akers*, 2018 UT App 235, ¶ 22, 438 P.3d 70 ("Defense counsel does not render deficient performance if counsel refrains from making futile objections."). In this case, Kufrin's trial attorneys could reasonably have believed that making a rule 403-based objection to the testimony in question would have been a futile exercise, and that such an objection lacked any other strategic value.

¶58 "Trial courts have wide latitude in making determinations of relevance, probativeness, and prejudice under rules 401 and 403." *State v. Boyd*, 2001 UT 30, ¶ 23, 25 P.3d 985 (quotation simplified). And "it's settled that under rule 403, courts should indulge a presumption in favor of admissibility." *State v. Forbush*, 2024 UT App 11, ¶ 44, 544 P.3d 1 (quotation simplified), *petition for cert. filed*, Feb. 26, 2024 (No. 20240205). For evidence to be subject to exclusion under rule 403, a court must conclude that the risk of "unfair prejudice" posed by the evidence's admission "substantially outweigh[s]" "its probative value." Utah R. Evid.

403. In this situation, the evidence in question had appreciable probative value, yet the risk of unfair prejudice posed by its admission was not especially significant.

¶59 As for probative value, the testimony in question shed light on, and provided context for, a possible reason Kufrin may have had for being upset with Peggy, especially in the wake of a hot tub party at which Peggy socialized with other men. In cases where a boyfriend stands accused of murdering his girlfriend, testimony about the state of their relationship can often provide important context for their actions or statements. And this was certainly the case here.

¶60 We find unpersuasive Kufrin's argument that the testimony's probative value was significantly diminished due to the passage of time. To be sure, some of the witnesses stated that—after the passage of some three decades—they could not come up with "specific words" that Peggy had said to them, and that they were offering more of a general perception of the status of the relationship. But Kufrin was able to cross-examine the witnesses about the extent to which their memories had faded over time, and he even called a memory expert to discuss the shortcomings of memory. Generally, these kinds of "shortcomings go to the testimony's weight, not its admissibility." *See State v. Nunez*, 2021 UT App 86, ¶ 35, 498 P.3d 458, *cert. denied*, 502 P.3d 270 (Utah 2021).[3]

---

3. We likewise find unpersuasive Kufrin's argument that the testimony had diminished probative value because "the defense had no opportunity to cross-examine Peggy concerning her statements to her coworkers." This is at least potentially the case with all hearsay-type evidence admitted pursuant to one of the many exceptions to the general ban on hearsay evidence. We simply do not agree with Kufrin's contention that his inability to

(continued…)

¶61 And we do not perceive this evidence as creating much risk of *unfairly* prejudicing the jury. "All effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered," and "rule 403 does not require a court to exclude all prejudicial evidence." *State v. Suhail*, 2023 UT App 15, ¶ 85, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023). Thus, evidence is not subject to exclusion under rule 403 simply because it is "prejudicial" to a party; to be subject to exclusion, evidence must "create[] an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror." *Id.* (quotation simplified); *see also State v. Sorenson*, 2023 UT App 159, ¶ 17, 542 P.3d 529 ("Unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis." (quotation simplified)).

¶62 Certainly, the testimony from Peggy's friends and coworkers to the effect that Peggy was unhappy and unsatisfied in her relationship with Kufrin, and that she was contemplating leaving him, was not helpful to Kufrin's defense. But this does not mean that it was *unfairly* prejudicial. Kufrin does not even attempt to argue that this evidence might have caused the jury to convict him based on bias, sympathy, hatred, contempt, or the like.

¶63 Instead, he notes that the statements were admitted into evidence under rule 803(3) of the Utah Rules of Evidence[4]—the exception to the hearsay rule for statements of a "declarant's then-existing state of mind"—and he asserts that statements admitted under this specific hearsay exception carry a danger that the jury might use them "as evidence of a defendant's intentions, acts, or

___

cross-examine Peggy about the statements in question appreciably reduced the probative value of those statements.

4. Kufrin does not mount an appellate challenge to the trial court's decision to admit these statements under rule 803(3).

culpability rather than the victim's state of mind." In support of this argument, Kufrin cites *State v. Auble*, a case in which a friend of the victim was allowed to testify that the victim told him that the defendant "threatened to kill her if she moved out." *See* 754 P.2d 935, 936 (Utah 1988). But *Auble* is materially distinguishable from this case because the statement at issue there went directly to the *defendant's* state of mind, in addition to the victim's. In this case, by contrast, none of the testimony in question included statements made by Kufrin; it consisted entirely of witnesses' descriptions of their own perceptions of Peggy's relationship with Kufrin, as well as witnesses' recollections of things Peggy had said to them about her own perception of that relationship. This case, therefore, simply does not present the same concerns as *Auble* because there is no risk that the jury would use the friends' and coworkers' testimony as evidence of Kufrin's specific intentions or actions. And we note, in any event, that the trial court's decision, in *Auble,* not to exclude the friend's testimony under rule 403 was affirmed by our supreme court. *See id.* at 937–38.

¶64 Accordingly, Kufrin's trial attorneys could have reasonably believed that any objection based in rule 403 would have been futile and that lodging it had no other strategic value, and for that reason Kufrin has not carried his burden of demonstrating that his attorneys performed deficiently by not lodging that particular objection. On that basis, we reject Kufrin's ineffective assistance claim.[5]

---

5. Kufrin also raises a cumulative error argument. But because we have not identified any errors, Kufrin cannot succeed in making a cumulative error argument. *See State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 ("Because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case." (quotation simplified)).

CONCLUSION

¶65    The trial court did not abuse its discretion in denying Kufrin's motion for a mistrial, nor did it abuse its discretion in allowing Examiner to offer timeline testimony about body decomposition and scalp slippage. And Kufrin has not carried his burden of demonstrating that his trial attorneys rendered ineffective assistance in not lodging a rule 403 objection to various witnesses' testimony regarding their perception of Peggy's relationship with Kufrin. Indeed, after reviewing the record in this case, we are left with the impression that the trial court, the prosecutors, and the defense attorneys all rendered exemplary work in trying Kufrin's case. Accordingly, we reject all of Kufrin's appellate arguments and therefore affirm his conviction.

––––––––––